## HASTINGS MFG. CO. v. FEDERAL TRADE COMMISSION.

### No. 9963.

Circuit Court of Appeals, Sixth Circuit.

Feb. 4, 1946.

Alfred E. Lindbloom and Joseph A. Vance, Jr., both of Detroit, Mich. (Joseph

A. Vance, Jr., Alfred E. Lindbloom, and Beaumont, Smith & Harris, all of Detroit, Mich., on the brief), for petitioner.

Everett F. Haycraft, of Washington, D. C. (W. T. Kelley and Everett F. Haycraft, both of Washington, D. C., on the brief), for respondent.

Before HICKS and SIMONS, Circuit Judges, and PICARD, District Judge.

SIMONS, Circuit Judge.

The petitioner seeks to review and set aside an order of the Federal Trade Commission which directs it to cease and desist from engaging in unfair methods of competition and practices in commerce in violation of § 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45. The practices found to be unfair consisted of the purchase from distributors of the competitive products of other manufacturers, making loans to the distributors and guaranteeing to them increased profits as compared with profits previously obtained in the handling of competitive products, when done as an inducement to the distributor to discontinue handling competitive products and to handle the petitioner's products exclusively or preferentially.

Before reaching the meritorious issues involved, it becomes necessary to dispose of petitioner's contention that the complaint, hearing and order were all invalid by reason of the rule of res judicata. It appears that prior to the filing of the complaint that led to the findings upon which the presently challenged order was based, the Commission had filed an identical complaint against the petitioner upon which a hearing was held, testimony taken and briefs filed. On December 27, 1940, this complaint was dismissed by the Commission "without prejudice," and on the same day the complaint in the present case was filed, alleging in count 1 facts substantially similar to those alleged in the earlier complaint, and in count 2 a violation of § 2(a) of the Clayton Act, 15 U.S.C.A. § 13(a). For reasons that do not appear, count 2 was later dismissed by the Commission and has disappeared from the case.

■ The petitioner contends that the Commission exercises only administrative acts, and that its rules and regulations do not authorize a dismissal without prejudice as that is a judicial act. It is difficult to follow the argument. It is true that the Federal Trade Commission has, as have other administrative agencies, the power to itself initiate an inquiry. When so initiated it is compelled to conduct a hearing at which it functions judicially as a body required to express "a reasoned conclusion." Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L.Ed. 656. So, to import into the procedural functions of the Commission a doctrine developed in the judicial process exercised by courts, while at the same time denying to the administrative tribunal judicial functions as distinguished from those purely administrative, would seem to be a contradiction in terms. Assuming, however, without deciding, that the Commission is subject to the rule of res judicata, the rule may not in good reason be applied to its proceedings freed from the limitations which govern its application by courts.

Whether or not the Commission is precluded from again complaining of trade practices after an unequivocal and unqualified dismissal of an earlier complaint in respect to identical practices, we have no need to determine. There has been argument pro and con with respect to the application to administrative tribunals generally, of the doctrine of res judicata. It may be that in the developing expertness of administrative agencies, and through broadened experience with the impact of questioned practices upon the national economy, what may at one period be considered without substantial effect upon competition, and without injury to traders or public, may at a later period be more clearly perceived to affect either or both. It may also be that in the succession of "Marmola" cases, Raladam Co. v. F.T.C., 6 Cir., 42 F.2d 430; F.T.C. v. Raladam Co., 283 U.S. 643, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191; Raladam Co. v. F.T.C., 6 Cir., 123 F.2d 34; and F.T.C. v. Raladam Co., 316 U.S. 149, 62 S.Ct. 966, 86 L.Ed. 1336, there is implicit a concept that a later proceeding is not barred by an earlier judgment even though the factual issues are identical, if a period of time has elapsed, the later proceeding is more completely supported by evidence, and the order is based upon findings of "meticulous particularity."

■ We need not, however, pursue the inquiry further because the hearing upon the first complaint did not proceed to a decision upon the merits, and the order of dismissal was not unqualified. As was said in C. G. Conn, Ltd., v. N. L. R. B., 7 Cir.,

108 F.2d 390, 393, "judicial, as well as quasi-judicial tribunals do not lose jurisdiction of a cause by its dismissal with a proviso authorizing its reinstatement." The cases are legion wherein a dismissal without prejudice has been construed as a reservation of a right to reinstate the proceeding. Vandalia R. Co. v. Schnull, 255 U.S. 113, 123, 41 S.Ct. 324, 65 L.Ed. 539; Lincoln Gas & Electric Light Co. v. Lincoln, 250 U.S. 256, 268, 39 S.Ct. 454, 63 L.Ed. 968; Gray v. City of Santa Fe, 10 Cir., 89 F.2d 406, 412; Hineline v. Minneapolis Honeywell Regulator Co., 8 Cir., 78 F.2d 854, 858; Columbia Casualty Co. v. Thomas, 5 Cir., 101 F.2d 151, 153; Krauthoff v. Kansas City Joint-Stock Land Bank, 8 Cir., 31 F.2d 75, 77; Morse v. Bragg, 71 App.D.C. 1, 107 F.2d 648, 649; In re McDermott, 7 Cir., 115 F.2d 582, 584. Additional precedents are given in the last cited case wherein it was said, "ordinarily a judgment or decree without prejudice never works an estoppel nor acts as a former adjudication."

The Commission found that Hastings had been engaged in the manufacture, sale and distribution of piston rings in interstate commerce in substantial competition with other manufacturers. It had begun the making of piston rings for the replacement trade in 1923, and late in 1935 had introduced a new type of ring under the name "steel-vent," for which great advantages were claimed. At the time it had about 600 jobbers throughout the United States through whom its piston rings were distributed to garages engaged in repair and servicing of motor cars. Its relative position in the industry, measured by volume of sales, was sixth or seventh. It had been the practice in the industry, for manufacturers to place with jobbers stock of rings on consignment, but it was not unusual for jobbers to have on hand substantial quantities of rings in excess of consigned stock which, owned by the jobbers, were commonly known as "overage." Most jobbers handled two or three competing lines.

In 1936 Hastings began an aggressive campaign to acquire new and, if possible, exclusive channels of distribution. Its general practice was to persuade jobbers to discontinue the lines of competitive piston rings handled by them and to stock Hastings rings exclusively. The policy in this respect was not rigid, and if unable to induce a jobber to become exclusively a Hastings distributor, it sought to induce the jobber to handle its rings preferentially. The inducements offered to the jobber to replace competing rings by Hastings rings, were used either singularly or in combination, as circumstances required. They consisted of the purchase from jobbers of their "overage" stock, making loans to them and guaranteeing to them increased profits from the sale of Hastings rings.

When complete substitution was effected it was usually with an understanding that Hastings rings would be handled exclusively; when substitution was partial the understanding was that Hastings rings would receive preferential sales effort. When a purchase of competing stock was made, the consigned stock of a competitor was returned to the consignor. In making purchases, Hastings paid the jobber the actual cost to him of the rings regardless of age, condition or value. The competitive rings were then shipped to its factory and, in most cases, destroyed. The quantities of competitive rings purchased from jobbers varied widely, the record showing purchases ranging from $100 to more than $15,000. Substantial portions of the lifted stock were still in good condition and salable.

From time to time Hastings made loans to its jobbers for the purpose of inducing them to become or continue to be exclusive distributors of Hastings rings or to concentrate their efforts on the Hastings line. During the years 1937 to 1940 exclusive, loans were made to 29 jobbers in an aggregate amount of approximately $151,000. Guarantees were given jobbers that if they undertook distribution of Hastings rings, their gross profit during the following year would be a specified percentage, (usually 50 percent) greater than their gross profits from the sale of competing rings during the preceding year, though there was evidence that in no instance was Hastings required to make good its guarantees. During the period 1923 to 1935, before these practices were inaugurated, Hastings had approximately 600 distributors, but thereafter, during the period 1936 to 1940, it secured about 900 new distributors and grew from one of the smallest ring manufacturers with national distribution, to become the second largest national distributor in the trade. In securing this large number of new jobbing accounts after 1935, including some of the larger distributors upon an exclusive or preferential basis, the Commission found that Hastings relied up-

on the practices described and that they represented its deliberate policy executed on a large scale. It therefore concluded that its practices constituted unfair methods of competition in commerce, and entered its order directing Hastings to cease and desist from pursuing its obsolescence protection policy, making loans to distributors and guaranteeing them increased gross profits "when done as an inducement to the distributor of automotive parts concerned to discontinue handling all products competitive with respondent's and thereafter handle respondent's products in lieu thereof, or when done upon any express or implied condition, agreement, or understanding that such distributor will discontinue handling all products competitive with those of respondent, or all such products of any competitor of respondent, and will handle respondent's products in lieu thereof."

Many of the Commission's findings, as above recited, are challenged by the petitioner, and its contentions in this respect have necessitated a careful review and analysis of the record. While the assailed practices, either singularly or in combination, may not universally have been pursued, and while in instances there may have been lacking specific proof of express agreements by jobbers to handle the Hastings line either exclusively or preferentially, enough was shown reasonably to warrant an inference by the Commission that the challenged practices were pursued upon a large scale, that they operated as an inducement in furtherance of an express or clearly implied agreement by jobbers that they would discontinue or immolate competing lines in favor of Hastings. The Federal Trade Commission Act, § 5(c), 15 U.S.C.A. § 45(c), provides that the findings of fact made by the Commission, if supported by evidence, are conclusive, and it has frequently been held that this applies not only to facts proven or stipulated, but also to inferences to be drawn from them which are for the Commission to determine —not the courts. F.T.C. v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534; F.T.C. v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L.Ed. 655; National Labor Relations Board v. Southern Bell Tel. Co., 319 U.S. 50, 60, 63 S.Ct. 905, 87 L.Ed. 1250; Corn Products Refining Co. et al. v. F.T.C., 324 U.S. 726, 65 S.Ct. 961; decided April 23, 1945; F.T.C. v. Standard Education Society, 302 U.S. 112, 58 S.Ct. 113, 82 L.Ed.

141. We are not able to say that the findings of the Commission are clearly wrong, and we accept them.

Section 5 of the Federal Trade Commission Act, supra, declares unfair methods of competition in commerce to be unlawful, empowers the Commission to prevent such methods, and authorizes it, after hearings and findings of fact, to issue orders requiring violators to cease and desist from such methods. The Act, however, does not define unfair methods of competition, and the Congress in defining its powers advisedly adopted a phrase which, as the Supreme Court has said, "does not 'admit of precise definition, but the meaning and application of which must be arrived at by what this court elsewhere has called "the gradual process of judicial inclusion and exclusion." ' " F.T.C. v. R. F. Keppel & Bro., 291 U.S. 304, 312, 54 S.Ct. 423, 426, 78 L.Ed. 814, citing F.T.C. v. Raladam Co., 283 U.S. 643, 648, 51 S.Ct. 587, 75 L.Ed. 1324, 79 A.L.R. 1191. In one of the earlier cases, F.T.C. v. Gratz, 253 U.S. 421, 40 S.Ct. 572, 575, 64 L.Ed. 993, decided 1920, when the proceeding established in 1914 was still considered a novelty and a new device in administrative machinery, the court said in reference to the phrase "unfair method of competition," that "it is for the courts, not the Commission, ultimately to determine as matter of law what they include. They are clearly inapplicable to practices never heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud, or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." The court there declined to enforce an order of the Commission directing a manufacturer to cease and desist from a practice of refusing to sell cotton ties unless the purchaser would agree to buy corresponding amounts of cotton bagging—the commonly known "tying" agreements.

To this decision Mr. Justice Brandeis, with Mr. Justice Clarke concurring, appended one of his more powerful dissents, pointing to the history of the legislation, its purpose to preserve competition through supervisory action of the Commission, the Commission's need to be ever vigilant if it discovered that any business concern had used any practice likely to result in public injury, the purpose of the Act as prophylactic rather than as punitive or remedial, and the deliberate use by the Congress of the

phrase "methods of competition" rather than "acts of competition." He argued vigorously for the enforcement of the Commission's order. He contended that "full-line forcing," "exclusive-dealing requirements" or "shutting off materials, supplies or machines from competitors" were well known methods of competition which had been held to be unfair, and that it was the legislative design to prevent any unfair method in competition from becoming a general practice, so that an "apprehended effect of an unfair method in suppressing competition by destroying rivals could be averted."

We are fully cognizant, in the usual case, of the impropriety in relying upon the rationale of a dissenting opinion. It is not controlling and generally furnishes no safe guide to decision. It becomes apparent, however, upon a review of later cases, that the court, without disapproval of the Gratz decision, has developed a broader concept of the authority conferred by Congress upon the Federal Trade Commission. Whether this was due to an awareness of the growing confidence of the Congress in the administrative process, or of the developing ingenuity of traders in pursuing practices not within the concept of unfairness developed in earlier decisions, we do not undertake to say, but in F.T.C. v. Algoma Lumber Co., 1934, 291 U.S. 67, 54 S.Ct. 315, 321, 78 L.Ed. 655 (the California White Pine case), it was said of earlier adjudications, that according to the law as then adjudged many competitive practices that today may be suppressed were not actionable wrongs, and that "competition may be unfair within the meaning of this statute and within the scope of the discretionary powers conferred on the Commission, though the practice condemned does not amount to fraud as understood in courts of law," and in F.T.C. v. R. F. Keppel & Bro., Inc., 291 U.S. 304, 54 S.Ct. 423, 426, 78 L.Ed. 814, (the break and take candy package), "A method of competition which casts upon one's competitors the burden of the loss of business unless they will descend to a practice which they are under a powerful moral compulsion not to adopt, even though it is not criminal, was thought to involve the kind of unfairness at which the statute was aimed."

Conscious as we are of the danger in lifting specific observations from their context, we are nevertheless impressed by the fact that acts not in themselves illegal or criminal, or even immoral, may, when repeated and continued and their impact upon commerce is fully revealed, constitute an unfair method of competition within the scope of the Commission's authority to regulate and forbid. So with the respondent's practices, it may not be illegal for a manufacturer to buy up the obsolescent or unsalable stock of his competitor so long as he does not throw it upon the market at cut-rate prices to destroy his competitor's business or the goodwill attaching to his product. It is not illegal for a manufacturer to finance his retail outlets or to guarantee them profits, but undoubtedly the utilization of these expedients, singularly or in combination, as an inducement to jobbers to throw out competing lines and to handle, exclusively or preferentially, the products of a manufacturer "from whom such blessings flow," may well be within the statutory concept of unfair methods of competition. Such inducements as constituent elements in a method of competition, are the "exclusive-dealing requirements" which Mr. Justice Brandeis so vigorously condemned, and the advantages to be derived therefrom, by both manufacturer and jobber, are closely akin to the unreasonable preferences and rebates long ago terminated by the Act to Regulate Commerce through powers conferred upon the Interstate Commerce Commission.

If we go too far perhaps in interpreting and applying what seems to be an enlarged concept of the powers of the Commission, certainly its present order derives sanction, even under the Gratz case, in the curbing of a practice which is against public policy because of its dangerous tendency unduly to hinder competition or create monopoly. It was not imperative, in order to bring into play the "prophylactic" action of the Commission, to prove that monopoly actually has been achieved. As was said in Federal Trade Commission v. Raladam Co., 316 U.S. 149, 152, 62 S.Ct. 966, 968, 86 L.Ed. 1336, "It is not necessary that the evidence show specifically that losses to any particular trader or traders arise from Raladam's success in capturing part of the market. One of the objects of the Act creating the Federal Trade Commission was to prevent potential injury by stopping unfair methods of competition in their incipiency. Fashion Originators' Guild v. Federal Trade Comm., 312 U.S. 457, 466, 668, 61 S.Ct. 703, 707, 85 L.Ed. 949." It was within the competency of the

258

Commission, in the present case, to infer that by the Hastings practices trade would be diverted from competitors who do not engage in such practices and that less highly financed manufacturers would be unable to compete, even though their product should be equal or superior in quality. It was equally within its competency to conclude, upon this record, that in some markets, or at least in a limited area in such markets, the Hastings practices had actually driven its competitors from the field.

Another consideration contributes to the conclusion that the Commission's order should be enforced. It derives from holdings in numerous cases that the unfair character of a method of competition depends largely upon the particular circumstances of each case, and such circumstances must include the time and place where the practices are followed. As was said in the Keppel case, supra, "The argument that a method used by one competitor is not unfair if others may adopt it without any restriction of competition between them was rejected by this court in F.T.C. v. Winsted Hosiery Co. [258 U.S. 483, 493, 42 S.Ct. 384, 66 L.Ed. 729]." The Commission may well have concluded that the practice of buying up and destroying obsolescent stocks of competitors, regardless of their value or salability, and destroying them, might force other manufacturers, for the sake of self-preservation, to pursue similar practices both as against Hastings and as against other competitors. It must be observed that the order of the Commission was made on December 9, 1944, in respect to practices that had been followed for years prior to that date. It must be remembered, also, that the American economy was then one of scarcity rather than of abundance, and still is. The result of such practices, if leading either to monopoly or general acceptance, would be that the consuming public would be deprived of available stocks of piston rings necessary to an imperative facility for transportation. The public interest in the cessation of such practices is therefore brought into bold relief.

Finally, while the court has not so far departed from the doctrine announced in the Gratz case that it is for the courts to determine what methods of competition are to be deemed unfair, there has been an ever growing dependency by the court upon the findings of administrative commissions generally, even when factual issues are not too clearly disassociated from questions of law, a doctrine which reached its zenith in Dobson v. Com'r, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248. In respect to the administrative agency here involved, it was specifically held in the Keppel case, supra, that the judgment of the Commission as to what practices are to be deemed unfair, is of weight. It was created with the avowed purpose of lodging administrative functions committed to it in "a body specially competent to deal with them by reason of information, experience and careful study of the business and economic conditions of the industry affected," and was organized in such manner as would "give to them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience." Report of Senate Committee on Interstate Commerce, No. 597, June 13, 1914, 63rd Cong., 2d Sess., pp. 9, 11. Giving such weight as is to be accorded to the experience of the Commission, we are not able to say that its conclusion upon the unfairness of the Hastings method of competition is unsound.

A decree may be entered for the enforcement of the Commission's order.