## FORTNER ENTERPRISES, INC. *v.* UNITED STATES STEEL CORP. ET AL.

No. 306.   Argued January 23, 1969.—Decided April 7, 1969.

*Kenneth L. Anderson* argued the cause for petitioner. With him on the briefs was *A. Scott Hamilton, Jr.*

*Macdonald Flinn* argued the cause for respondents. With him on the brief were *Albert F. Reutlinger, L. L. Lewis,* and *William H. Buchanan.*

MR. JUSTICE BLACK delivered the opinion of the Court.

This case raises a variety of questions concerning the proper standards to be applied by a United States district court in passing on a motion for summary judgment in a civil antitrust action. Petitioner, Fortner Enterprises, Inc., filed this suit seeking treble damages and an injunction against alleged violations of §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 2. The complaint charged that respondents, United States Steel Corp. and its wholly owned subsidiary, the United States Steel Homes Credit

Corp., had engaged in a contract, combination, and conspiracy to restrain trade and to monopolize trade in the sale of prefabricated houses. It alleged that there was a continuing agreement between respondents "to force corporations and individuals, including the plaintiff, as a condition to availing themselves of the services of United States Steel Homes Credit Corporation, to purchase at artificially high prices only United States Steel Homes . . . ." Specifically, petitioner claimed that in order to obtain loans totaling over $2,000,000 from the Credit Corp. for the purchase and development of certain land in the Louisville, Kentucky, area, it had been required to agree, as a condition of the loans, to erect a prefabricated house manufactured by U. S. Steel on each of the lots purchased with the loan proceeds. Petitioner claimed that the prefabricated materials were then supplied by U. S. Steel at unreasonably high prices and proved to be defective and unusable, thus requiring the expenditure of additional sums and delaying the completion date for the development. Petitioner sought treble damages for the profits thus lost, along with a decree enjoining respondents from enforcing the requirement of the loan agreement that petitioner use only houses manufactured by U. S. Steel.

After pretrial proceedings in which a number of affidavits and answers to interrogatories were filed, the District Court entered summary judgment for respondents, holding that petitioner's allegations had failed to raise any question of fact as to a possible violation of the antitrust laws. Noting that the agreement involved here was essentially a tying arrangement, under which the purchaser was required to take a tied product—here prefabricated homes—as a condition of being allowed to purchase the tying product—here credit, the District Judge held that petitioner had failed to establish the prerequisites of illegality under our tying cases, namely

sufficient market power over the tying product and fore-closure of a substantial volume of commerce in the tied product. The Court of Appeals affirmed without opinion, and we granted certiorari, 393 U. S. 820 (1968). Since we find no basis for sustaining this summary judgment, we reverse and order that the case proceed to trial.

We agree with the District Court that the conduct challenged here primarily involves a tying arrangement of the traditional kind. The Credit Corp. sold its credit only on the condition that petitioner purchase a certain number of prefabricated houses from the Homes Division of U. S. Steel. Our cases have made clear that, at least when certain prerequisites are met, arrangements of this kind are illegal in and of themselves, and no specific showing of unreasonable competitive effect is required. The discussion in *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 5–6 (1958), is dispositive of this question:

"[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. . . .

". . . Where [tying] conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed 'tying agreements serve hardly any purpose beyond the suppression of competition.' *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 305–306. They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage

in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons 'tying agreements fare harshly under the laws forbidding restraints of trade.' *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 606. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected. *International Salt Co.* v. *United States,* 332 U. S. 392." (Footnote omitted.)

Despite its recognition of this strict standard, the District Court held that petitioner had not even made out a case for the jury. The court held that respondents did not have "sufficient economic power" over credit, the tying product here, because although the Credit Corp.'s terms evidently made the loans uniquely attractive to petitioner, petitioner had not proved that the Credit Corp. enjoyed the same unique attractiveness or economic control with respect to buyers generally. The court also held that the amount of interstate commerce affected was "insubstantial" because only a very small percentage of the land available for development in the area was foreclosed to competing sellers of prefabricated houses by the contract with petitioner. We think it plain that the District Court misunderstood the two controlling standards and misconceived the extent of its authority to evaluate the evidence in ruling on this motion for summary judgment.

A preliminary error that should not pass unnoticed is the District Court's assumption that the two prerequisites mentioned in *Northern Pacific* are standards that petitioner must meet in order to prevail on the merits. On the contrary, these standards are necessary only to bring

into play the doctrine of *per se* illegality. Where the standards were found satisfied in *Northern Pacific,* and in *International Salt Co.* v. *United States,* 332 U. S. 392 (1947), this Court approved summary judgment *against* the defendants but by no means implied that inability to satisfy these standards would be fatal to a plaintiff's case. A plaintiff can still prevail on the merits whenever he can prove, on the basis of a more thorough examination of the purposes and effects of the practices involved, that the general standards of the Sherman Act have been violated. Accordingly, even if we could agree with the District Court that the *Northern Pacific* standards were not satisfied here, the summary judgment against petitioner still could not be entered without further examination of petitioner's general allegations that respondents conspired together for the purpose of restraining competition and acquiring a monopoly in the market for prefabricated houses. And such an examination could rarely justify summary judgment with respect to a claim of this kind, for as we said in *Poller* v. *Columbia Broadcasting,* 368 U. S. 464, 473 (1962):

> "We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" (Footnote omitted.)

We need not consider, however, whether petitioner is entitled to a trial on this more general theory, for it is clear that petitioner raised questions of fact which, if

proved at trial, would bring this tying arrangement within the scope of the *per se* doctrine. The requirement that a "not insubstantial" amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie, and hence we could not approve of the trial judge's conclusions on this issue even if we agreed that his definition of the relevant market was the proper one.[1] An analysis of market shares might become relevant if it were alleged that an apparently small dollar-volume of business actually represented a substantial part of the sales for which competitors were bidding. But normally the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis,* is foreclosed to competitors by the tie, for as we said in *International Salt,* it is "unreasonable, *per se,* to foreclose competitors from any substantial market" by a tying arrangement, 332 U. S., at 396.

The complaint and affidavits filed here leave no room for doubt that the volume of commerce allegedly foreclosed was substantial. It may be true, as respondents claim, that petitioner's annual purchases of houses from U. S. Steel under the tying arrangement never exceeded

---

[1] Since the loan agreements obligated petitioner to erect houses manufactured by U. S. Steel on the land acquired, the trial judge thought the relevant foreclosure was the percentage of the undeveloped land in the county that was no longer open for sites on which homes made by competing producers could be built. This apparently was an insignificant .00032%. But of course the availability of numerous vacant lots on which houses might legally be erected would be small consolation to competing producers once the economic demand for houses had been pre-empted by respondents. It seems plain that the most significant percentage figure with reference to the tied product is the percentage of annual sales of houses, or prefabricated houses, in the area that was foreclosed to other competitors by the tying arrangement.

$190,000, while more than $500,000 in annual sales was involved in the tying arrangement held illegal in *International Salt,* but we cannot agree with respondents that a sum of almost $200,000 is paltry or "insubstantial." In any event, a narrow focus on the volume of commerce foreclosed by the particular contract or contracts in suit would not be appropriate in this context. As the special provision awarding treble damages to successful plaintiffs illustrates, Congress has encouraged private antitrust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in free competition. See *Perma Life Mufflers* v. *International Parts Corp.,* 392 U. S. 134, 138–139 (1968). For purposes of determining whether the amount of commerce foreclosed is too insubstantial to warrant prohibition of the practice, therefore, the relevant figure is the total volume of sales tied by the sales policy under challenge, not the portion of this total accounted for by the particular plaintiff who brings suit. In *International Salt* the $500,000 total represented the volume of tied sales to all purchasers, and although this amount was directly involved because the case was brought by the Government against the practice generally, the case would have been no less worthy of judicial scrutiny if it had been brought by one individual purchaser who accounted for only a fraction of the $500,000 in tied sales. In the present case, the annual sales allegedly foreclosed by respondents' tying arrangements throughout the country totaled almost $4,000,000 in 1960, more than $2,800,000 in 1961, and almost $2,300,000 in 1962. These amounts could scarcely be regarded as insubstantial.

The standard of "sufficient economic power" does not, as the District Court held, require that the defendant have a monopoly or even a dominant position throughout the market for the tying product. Our tie-in cases have made unmistakably clear that the economic power over

the tying product can be sufficient even though the power falls far short of dominance and even though the power exists only with respect to some of the buyers in the market. See, *e. g., International Salt; Northern Pacific; United States* v. *Loew's Inc.*, 371 U. S. 38 (1962). As we said in the *Loew's* case, 371 U. S., at 45: "Even absent a showing of market dominance, the crucial economic power may be inferred from the tying product's desirability to consumers or from uniqueness in its attributes."

These decisions rejecting the need for proof of truly dominant power over the tying product have all been based on a recognition that because tying arrangements generally serve no legitimate business purpose that cannot be achieved in some less restrictive way, the presence of any appreciable restraint on competition provides a sufficient reason for invalidating the tie. Such appreciable restraint results whenever the seller can exert some power over some of the buyers in the market, even if his power is not complete over them and over all other buyers in the market. In fact, complete dominance throughout the market, the concept that the District Court apparently had in mind, would never exist even under a pure monopoly. Market power is usually stated to be the ability of a single seller to raise price and restrict output, for reduced output is the almost inevitable result of higher prices. Even a complete monopolist can seldom raise his price without losing some sales; many buyers will cease to buy the product, or buy less, as the price rises. Market power is therefore a source of serious concern for essentially the same reason, regardless of whether the seller has the greatest economic power possible or merely some lesser degree of appreciable economic power. In both instances, despite the freedom of some or many buyers from the seller's power, other buyers—whether few or many, whether scattered throughout the market or part of some group within the market—

can be forced to accept the higher price because of their stronger preferences for the product, and the seller could therefore choose instead to force them to accept a tying arrangement that would prevent free competition for their patronage in the market for the tied product. Accordingly, the proper focus of concern is whether the seller has the power to raise prices, or impose other burdensome terms such as a tie-in, with respect to any appreciable number of buyers within the market.

The affidavits put forward by petitioner clearly entitle it to its day in court under this standard. A construction company president stated that competitors of U. S. Steel sold prefabricated houses and built conventional homes for at least $400 less than U. S. Steel's price for comparable models. Since in a freely competitive situation buyers would not accept a tying arrangement obligating them to buy a tied product at a price higher than the going market rate, this substantial price differential with respect to the tied product (prefabricated houses) in itself may suggest that respondents had some special economic power in the credit market. In addition, petitioner's president, A. B. Fortner, stated that he accepted the tying condition on respondents' loan solely because the offer to provide 100% financing, lending an amount equal to the full purchase price of the land to be acquired, was unusually and uniquely advantageous to him. He found that no such financing was available to his corporation on any such cheap terms from any other source during the 1959–1962 period. His views on this were supported by the president of a finance company in the Louisville area, who stated in an affidavit that the type of advantageous financing plan offered by U. S. Steel "was not available to Fortner Enterprises or any other potential borrower from or through Louisville Mortgage Service Company or from

or through any other lending institution or mortgage company to this affiant's knowledge during this period."

We do not mean to accept petitioner's apparent argument that market power can be inferred simply because the kind of financing terms offered by a lending company are "unique and unusual." We do mean, however, that uniquely and unusually advantageous terms can reflect a creditor's unique economic advantages over his competitors.[2] Since summary judgment in antitrust cases is disfavored, *Poller, supra,* the claims of uniqueness in this case should be read in the light most favorable to petitioner. They could well mean that U. S. Steel's subsidiary Credit Corp. had a unique economic ability to provide 100% financing at cheap rates. The affidavits show that for a three-to-four-year period no other financial institution in the Louisville area was willing to match the special credit terms and rates of interest available from U. S. Steel. Since the possibility of a decline in property values, along with the difficulty of recovering full market value in a foreclosure sale, makes it desirable for a creditor to obtain collateral greater in value than the loan it secures, the unwillingness of competing financial institutions in the area to offer 100% financing probably reflects their feeling that they could not profitably lend money on the risks involved. U. S. Steel's subsidiary Credit Corp., on the other hand, may

---

[2] Uniqueness confers economic power only when other competitors are in some way prevented from offering the distinctive product themselves. Such barriers may be legal, as in the case of patented and copyrighted products, *e. g., International Salt; Loew's,* or physical, as when the product is land, *e. g., Northern Pacific.* It is true that the barriers may also be economic, as when competitors are simply unable to produce the distinctive product profitably, but the uniqueness test in such situations is somewhat confusing since the real source of economic power is not the product itself but rather the seller's cost advantage in producing it.

well have had a substantial competitive advantage in providing this type of financing because of economies resulting from the nationwide character of its operations. In addition, potential competitors such as banks and savings and loan associations may have been prohibited from offering 100% financing by state or federal law.[3] Under these circumstances the pleadings and affidavits sufficiently disclose the possibility of market power over borrowers in the credit market to entitle petitioner to go to trial on this issue.

It may also be, of course, that these allegations will not be sustained when the case goes to trial. It may turn out that the arrangement involved here serves legitimate business purposes and that U. S. Steel's subsidiary does not have a competitive advantage in the credit market. But on the record before us it would be impossible to reach such conclusions as a matter of law, and it is not our function to speculate as to the ultimate findings of fact. We therefore conclude that the showing made by petitioner was sufficient on the market power issue.

Brief consideration should also be given to respondents' additional argument that even if their unique kind of financing reflected economic power in the credit market, and even if a substantial volume of commerce was affected, the arrangement involving credit should not be held illegal under normal tie-in principles. In support of this, respondents suggest that every sale on credit in effect involves a tie. They argue that the offering of favorable credit terms is simply a form of price competition equivalent to the offering of a comparable reduction in the cash price of the tied product. Consumers should not, they say, be deprived of such

---

[3] See, e. g., Federal Reserve Act § 24, 38 Stat. 273, as amended, 12 U. S. C. § 371; 12 CFR § 545.6–14 (c).

advantageous services, and they suffer no harm because they can buy the tangible product with credit obtained elsewhere if the combined price of the seller's credit-product package is less favorable than the cost of purchasing the components separately.

All of respondents' arguments amount essentially to the same claim—namely, that this opinion will somehow prevent those who manufacture goods from ever selling them on credit. But our holding in this case will have no such effect. There is, at the outset of every tie-in case, including the familiar cases involving physical goods, the problem of determining whether two separate products are in fact involved. In the usual sale on credit the seller, a single individual or corporation, simply makes an agreement determining when and how much he will be paid for his product. In such a sale the credit may constitute such an inseparable part of the purchase price for the item that the entire transaction could be considered to involve only a single product. It will be time enough to pass on the issue of credit sales when a case involving it actually arises. Sales such as that are a far cry from the arrangement involved here, where the credit is provided by one corporation on condition that a product be purchased from a separate corporation,[4] and where the borrower contracts to obtain a large sum of money over and above that needed to pay the seller for the physical products purchased. Whatever the standards for determining exactly when a transaction involves only a "single product," we cannot see how an arrangement such as that present in this case could ever be said to involve only a single product.

---

[4] Cf. *Perma Life Mufflers,* 392 U. S., at 141–142; *Timken Co.* v. *United States,* 341 U. S. 593, 598 (1951); *Kiefer-Stewart Co.* v. *Seagram & Sons,* 340 U. S. 211, 215 (1951); *United States* v. *Yellow Cab Co.,* 332 U. S. 218, 227 (1947).

Nor does anything in respondents' arguments serve to distinguish credit from other kinds of goods and services, all of which may, when used as tying products, extend the seller's economic power to new markets and foreclose competition in the tied product. The asserted business justifications for a tie of credit are not essentially different from the justifications that can be advanced when the tying product is some other service or commodity. Although advantageous credit terms may be viewed as a form of price competition in the tied product, so is the offer of any other tying product on advantageous terms. In both instances, the seller can achieve his alleged purpose, without extending his economic power, by simply reducing the price of the tied product itself.[5]

The potential harm is also essentially the same when the tying product is credit. The buyer may have the choice of buying the tangible commodity separately, but as in other cases the seller can use his power over the tying product to win customers that would otherwise have constituted a market available to competing producers of the tied product. "[C]ompetition on the merits with respect to the tied product is inevitably curbed." *Northern Pacific,* 356 U. S., at 6. Nor can it be assumed that because the product involved is money needed to finance a purchase, the buyer would not have been able to purchase from anyone else without the seller's attractive credit. A buyer might have a strong preference for a seller's credit because it would eliminate the need for him to lay out personal funds, borrow from relatives, put up additional collateral, or obtain guaran-

---

[5] Where price reductions on the tied product are made difficult in practice by the structure of that market, the seller can still achieve his alleged objective by offering other kinds of fringe benefits over which he has no economic power.

tors, but any of these expedients might have been chosen to finance a purchase from a competing producer if the seller had not captured the sale by means of his tying arrangement.

In addition, barriers to entry in the market for the tied product are raised since, in order to sell to certain buyers, a new company not only must be able to manufacture the tied product but also must have sufficient financial strength to offer credit comparable to that provided by larger competitors under tying arrangements. If the larger companies have achieved economies of scale in their credit operations, they can of course exploit these economies legitimately by lowering their credit charges to consumers who purchase credit only, but economies in financing should not, any more than economies in other lines of business, be used to exert economic power over other products that the company produces no more efficiently than its competitors.

For all these reasons we can find no basis for treating credit differently in principle from other goods and services. Although money is a fungible commodity—like wheat or, for that matter, unfinished steel—credit markets, like other markets, are often imperfect, and it is easy to see how a big company with vast sums of money in its treasury could wield very substantial power in a credit market. Where this is true, tie-ins involving credit can cause all the evils that the antitrust laws have always been intended to prevent, crippling other companies that are equally, if not more, efficient in producing their own products. Therefore, the same inquiries must be made as to economic power over the tying product and substantial effect in the tied market, but where these factors are present no special treatment can be justified solely because credit, rather than some other product, is the source of the tying leverage used to restrain competition.

510

The judgment of the Court of Appeals is reversed, and the case is remanded with directions to let this suit proceed to trial.

*Reversed and remanded.*

MR. JUSTICE WHITE, with whom MR. JUSTICE HARLAN joins, dissenting.

The judicially developed proscription of certain kinds of tying arrangements has been commonly understood to be this: an antitrust defendant who ties the availability of one product to the purchase of another violates § 1 of the Sherman Act if he both has sufficient market power in the tying product and affects a substantial quantity of commerce in the tied product. This case further defines the degree of market power which is sufficient to invoke the tying rule. Prior cases provide some guidance but are not dispositive. Admittedly, monopoly power or dominance in the tying market, *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 608–611 (1953), is not necessary; it is enough if there is "sufficient economic power to impose an appreciable restraint on free competition in the tied product," *Northern Pacific R. Co.* v. *United States,* 356 U. S. 1, 11 (1958). The Court indicated in *United States* v. *Loew's Inc.,* 371 U. S. 38, 45 (1962), that this could be inferred from "the tying product's desirability to consumers or from uniqueness in its attributes."

The Court does not purport to abandon the general rule that some market power in the tying product is essential to a § 1 violation. But it applies the rule to permit proscription of a seller's extension of favorable credit terms conditioned on the purchase of an agreed quantity of the seller's product without any offer of proof that the seller has any market power in the credit market itself. Although the credit extended was for the purchase and development of land on which the purchased

houses were to be built, the Court's logic dictates the same result if unusually attractive credit terms had been offered simply for the purchase of the houses themselves. Proscription of the sale of goods on easy credit terms as an illegal tie without proof of market power in credit not only departs from established doctrine but also in my view should not be outlawed as *per se* illegal under the Sherman Act. Provision of favorable credit terms may be nothing more or less than vigorous competition in the tied product, on a basis very nearly approaching the price competition which it has always been the policy of the Sherman Act to encourage. Moreover, it is far from clear that, absent power in the credit market, credit financing of purchases should be regarded as a tie of two distinct products any more than a commodity should be viewed as tied to its own price. Since provision of credit by sellers may facilitate competition, since it may provide essential risk or working capital to entrepreneurs or businessmen, and since the logic of the majority's opinion does away in practice with the requirement of showing market power in the tying product while retaining that requirement in form, the majority's *per se* rule is inappropriate. I dissent.

In this case there is no offer to prove monopoly or dominance in the tying product—money. And in no sense is the money provided to petitioner unique, even though the terms on which it was furnished and was to be repaid may have been advantageous, and indeed the money itself available from no other source on equally good terms. United States Steel was principally interested in the sale of houses, and petitioner in the economical development of its housing project. Before concluding that the financing arrangements on which U. S. Steel sold its houses amounted to anything more than a price reduction on the houses, or that easy financing terms show that their provider has market

power in the money market, the Court should have in mind the rationale on which the illegality of tying arrangements is based.

There is general agreement in the cases [1] and among commentators [2] that the fundamental restraint against which the tying proscription is meant to guard is the use of power over one product to attain power over another, or otherwise to distort freedom of trade and competition in the second product. This distortion injures the buyers of the second product, who because of their preference for the seller's brand of the first are artificially forced to make a less than optimal choice in the second. And even if the customer is indifferent among brands of the second product and therefore loses nothing by agreeing to use the seller's brand of the second in order to get his brand of the first,[3] such tying

[1] *E. g., United States* v. *Loew's Inc.*, 371 U. S. 38, 44–45 (1962); *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1, 6–7 (1958); *Times-Picayune Pub. Co.* v. *United States*, 345 U. S. 594, 611 (1953).

[2] *E. g.*, Report of the Attorney General's National Committee to Study the Antitrust Laws 145 (1955); Austin, The Tying Arrangement: A Critique and Some New Thoughts, 1967 Wis. L. Rev. 88; Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19 (1957); Day, Exclusive Dealing, Tying and Reciprocity—A Reappraisal, 29 Ohio St. L. J. 539, 540–541 (1968); Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv. L. Rev. 50, 60–61 (1958).

[3] Theoretically, the tie may do the tier little good unless the buyer is in that position. Even if the seller has a complete monopoly in the tying product, this is the case. The monopolist can exact the maximum price which people are willing to pay for his product. By definition, if his price went up he would lose customers. If he then refuses to sell the tying product without the tied product, and raises the price of the tied product above market, he will also lose customers. The tying link works no magic. However, difficulty in extracting the full monopoly profit without the tie, Burstein, A Theory of Full-Line Forcing, 55 Nw. U. L. Rev. 62 (1960), or the marginal advantage of a guaranteed first refusal from otherwise indifferent customers of the tied product, or other advantages mentioned in the text, may make the tie beneficial to its originator.

agreements may work significant restraints on competition in the tied product. The tying seller may be working toward a monopoly position in the tied product [4] and, even if he is not, the practice of tying forecloses other sellers of the tied product and makes it more difficult for new firms to enter that market. They must be prepared not only to match existing sellers of the tied product in price and quality, but to offset the attraction of the tying product itself. Even if this is possible through simultaneous entry into production of the tying product, entry into both markets is significantly more expensive than simple entry into the tied market, and shifting buying habits in the tied product is considerably more cumbersome and less responsive to variations in competitive offers.[5] In addition to these anticompetitive effects in the tied product, tying arrangements may be used to evade price control in the tying product through clandestine transfer of the profit to the tied product; [6] they may be used as a counting device to effect price discrimination; [7] and they may be used to force a full line of products on the customer [8] so as

---

[4] If the monopolist uses his monopoly profits in the first market to underwrite sales below market price in the second, his monopoly business becomes less profitable. There remains an incentive to do so nonetheless when he thinks he can obtain a monopoly in the tied product as well, permitting him later to raise prices without fear of entry to recoup the monopoly profit he has forgone. But just as the firm whose deep pocket stems from monopoly profits in the tying product may make this takeover, so may anyone else with a deep pocket, from whatever source.

[5] Even when the terms of the tie allow a competitor to obtain the business in the tied product simply by offering a price lower than, rather than equal to, the tier's, the Court has found sufficient restriction in the tied product, as in the *Northern Pacific* case.

[6] Bowman, Tying Arrangements and the Leverage Problem, 67 Yale L. J. 19, 21–23 (1957).

[7] *Id.,* at 23–24.

[8] Burstein, A Theory of Full-Line Forcing, 55 Nw. U. L. Rev. 62 (1960).

to extract more easily from him a monopoly return on one unique product in the line.[9]

All of these distortions depend upon the existence of some market power in the tying product quite apart from any relationship which it might bear to the tied product. In this case, what proof of any market power in the tying product has been alleged? Only that the tying product—money—was not available elsewhere on equally good terms, and perhaps not at all. Let us consider these possibilities in turn.

First, if enough money to proceed was available elsewhere and U. S. Steel was simply offering credit at a lower price, in terms of risk of loss, repayment terms, and interest rate, surely this does not establish that U. S.

---

[9] Tie-ins may also at times be beneficial to the economy. Apart from the justifications discussed in the text are the following. They may facilitate new entry into fields where established sellers have wedded their customers to them by ties of habit and custom. *Brown Shoe Co.* v. *United States,* 370 U. S. 294, 330 (1962) ; Note, Newcomer Defenses: Reasonable Use of Tie-ins, Franchises, Territorials, and Exclusives, 18 Stan. L. Rev. 457 (1966). They may permit clandestine price cutting in products which otherwise would have no price competition at all because of fear of retaliation from the few other producers dealing in the market. They may protect the reputation of the tying product if failure to use the tied product in conjunction with it may cause it to misfunction. Compare *International Business Machines Corp.* v. *United States,* 298 U. S. 131, 138–140 (1936), and *Standard Oil Co.* v. *United States,* 337 U. S. 293, 306 (1949), with *Pick Mfg. Co.* v. *General Motors Corp.,* 80 F. 2d 641 (C. A. 7th Cir. 1935), aff'd, 299 U. S. 3 (1936). And, if the tied and tying products are functionally related, they may reduce costs through economies of joint production and distribution. These benefits which may flow from tie-ins, though perhaps in some cases a potential basis for an affirmative defense, were not sufficient to avoid the imposition of a *per se* proscription, once market power has been demonstrated. But in determining whether even the market-power requirement should be eliminated, as the logic of the majority opinion would do, extending the *per se* rule to absolute dimensions, the fact that tie-ins are not entirely unmitigated evils should be borne in mind.

Steel had market power by any measure in the money market. There was nothing unique about U. S. Steel's money except its low cost to petitioner. A low price on a product is ordinarily no reflection of market power. It proves neither the existence of such power nor its absence, although absence of power may be the more reasonable inference. One who has such power benefits from it precisely because it allows him to raise prices, not lower them, and ordinarily he does so.

A low price in the tying product—money, the most fungible item of trade since it is by definition an economic counter—is especially poor proof of market power when untied credit is available elsewhere. In that case, the low price of credit is functionally equivalent to a reduction in the price of the houses sold. Since the buyer has untied credit available elsewhere, he can compare the houses-credit package of U. S. Steel as competitive with the price of the untied credit plus the cost of houses from another source. By cutting the price of his houses, a competitor of U. S. Steel can compete with U. S. Steel houses on equal terms since U. S. Steel's money is no more desirable to the purchaser than money from another source except in point of price. The same money which U. S. Steel is willing to risk or forgo by providing better credit terms it could sacrifice by cutting the price of houses. There is no good reason why U. S. Steel should always be required to make the price cut in one form rather than another, which its purchaser prefers.

Provision of credit financing by the seller of a commodity to its buyer is a very common event in the American economy. Often the seller is not willing to supply credit generally for the business and personal needs of the public at large, but restricts his credit to the purchasers of the commodity which he is principally in the business of selling. In all such cases, the com-

modity may be viewed as tied to the credit. In all such cases, the money itself is no more desirable from one source than from another. But in all such cases, under the majority opinion, the mere fact that the credit is offered on uniquely advantageous terms makes the transaction a *per se* violation of § 1 of the Sherman Act. And so long as the buyer has chosen to accept the seller's credit terms over any others available to him, the buyer, like petitioner here, must have viewed them as uniquely advantageous to him. The logic of the majority opinion, then, casts great doubt on credit financing by sellers. I would not proscribe credit financing by sellers who had no independently demonstrable power in the credit market. Unlike the majority, I am unable to read petitioner's affidavits, the fruit of years of pretrial discovery, to offer any independent proof whatever of such market power.[10]

Second, adopting the other assumption, that sufficient credit to go forward with the enterprise was simply unavailable to petitioner from any other source at all, the result in this case is even worse. Were it not for the credit extended by U. S. Steel, petitioner would have been unable to carry out its development. U. S. Steel would not have foreclosed anyone from selling

---

[10] I agree with the majority that the affidavits are not *inconsistent* with a "possibility of market power" and that such power might be shown by showing certain kinds of "unique economic ability." But I cannot see how petitioner offers to prove this, although by taking judicial notice of the possibility that U. S. Steel may have operated free of legal restraints on other lenders otherwise willing to provide 100% financing—a possibility not mentioned by petitioner—the majority suggests to petitioner an element of the sort of detailed description of one facet of the credit market which, with much more information about the whole of the market, would be relevant. But this was not the basis on which petitioner offered to go to trial and I would not remand for trial even under the applicable *Poller* standard.

houses to petitioner since no one would have sold any houses to petitioner. A seller who is willing to take credit risks which no one else finds acceptable is simply engaging in the hard and risky competition which it is the policy of the Sherman Act to encourage. And if he may not do so, then those businesses and entrepreneurs who depend for their survival and growth or for the initiation of new enterprises on the availability of credit financing from sellers may well fail for lack of credit availability from other sources. Of course, if the credit was unavailable elsewhere because U. S. Steel was a monopolist of credit in a relevant market— which petitioner does not assert—the tie would be illegal. But here it was evidently unavailable elsewhere simply because others were not willing to match U. S. Steel's relatively low price for acceptance of high risk.

Neither petitioner nor the Court asserts that under prior antitrust doctrine U. S. Steel would have violated § 1 of the Sherman Act or § 3 of the Clayton Act [11] if it had simply contracted to supply all the houses Fortner required to develop the particular tract of land involved here—a requirements contract for the development—even if the price for the houses was particularly advantageous. What triggers the application of the antitrust laws is the asserted tying arrangement, the sale of one product conditioned on the purchase of another. And it is not all tying transactions in general but only those where leverage in one market has been used to distort another which so far have been held illegal restraints of trade. The basis for the rule is clear where the seller is dominant in the tying product market, where the product is patented, or where it is in short supply. In these cases the restraint on competitors in the tied product as well as on buyers of the tying product

---

[11] 38 Stat. 731, 15 U. S. C. § 14.

is reasonably apparent. But I question that buyers' acceptance of the tie-in—the simple fact that there are customers—will always suffice to prove market power in the tying product. Where the seller exercises no market power in the tying item but buyers prefer the tie-in because the seller offers the tying product on favorable terms—where the price is unusually low or where the seller gives the product away conditioned on buying other merchandise—the seller in effect is merely competing in the tied product market. Buyers are not burdened. They may buy both tied and tying products elsewhere on normal terms. Nor are the seller's competitors restrained. The economic advantage of the tie-in to buyers can be matched by other sellers of the tied product by offering lower prices on that product. Promotional tie-ins effected by underpricing the tying product do not themselves prove there is any market power to exercise in that product market, unless the economic resources to withstand lower profit margins and the willingness to compete in this manner are themselves suspect. If they are, however, they should as surely taint and muffle hard price competition in the tied market itself, a result which, short of a § 2 violation, it would be difficult to reach under the Sherman Act.

I cannot join such a complete evisceration of the requirement that market power in the tying product be shown before a tie-in becomes illegal under § 1. Certainly it is unnecessary to erect a § 1 *per se* ban on promotional tie-ins in order to protect the tied product market. If the resulting exclusion of competitors is of sufficient significance to threaten competition in that market, the transaction may be reached as a requirements contract under § 3 of the Clayton Act.[12] If the

---

[12] The arrangements proscribed by § 3 relate only to "goods, wares, merchandise, machinery, supplies, or other commodities . . . ." 38 Stat. 731, 15 U. S. C. § 14.

promotional tie is in effect price discrimination, that too can be examined under statutes designed for that purpose.[13] Moreover, the transaction could be dealt with as an unfair method of competition under § 5 of the Federal Trade Commission Act, 38 Stat. 719, as amended, 15 U. S. C. § 45. For example, in *Hastings Mfg. Co.* v. *FTC*, 153 F. 2d 253 (C. A. 6th Cir.), cert. denied, 328 U. S. 853 (1946), it was, *inter alia*, held an unfair method of competition for a seller of piston rings, ranking sixth or seventh in the industry, to attempt to obtain exclusive dealers or preferential dealers by guaranteeing profits to the dealers and making loans to them, tied to the purchase of the piston rings. Relying on the expertise of the FTC and the precedents of this Court, the Court of Appeals concluded that although it "is not illegal for a manufacturer to finance his retail outlets," 153 F. 2d, at 257 (a proposition called into question by today's decision) tying this to exclusive or preferential dealing was an unfair method of competition.

The principal evil at which the proscription of tying aims is the use of power in one market to acquire power in, or otherwise distort, a second market. This evil simply does not exist if there is no power in the first market. The first market here is money, a completely fungible item. I would not apply a *per se* rule here without independent proof of market power. Cutting prices in the credit market is more likely to reflect a competitive attempt to offset the market power of others in the tied product than it is to reflect existing market power in the credit market. Those with real power do not offer uniquely advantageous deals to their customers; they raise prices.

This is not, of course, to say that if market power were proved in the tying product the *per se* rule would

---

[13] Robinson-Patman Price Discrimination Act, 49 Stat. 1526, as amended, 15 U. S. C. § 13 *et seq.*

be inapplicable, or that it is necessarily impossible to prove market power in the credit market. There may be so few suppliers of credit in a certain relevant market, for example, that they have the power among them to manipulate the price and terms of credit, not necessarily by conspiracy, but by parallel behavior. Through proof that such a situation existed, or through proof of some other sort, an antitrust plaintiff might be able to show market power in the credit market, and if this were coupled with a tie I would consider the arrangement *per se* illegal under conventional antitrust doctrine. However, I do not consider petitioner's allegations that U. S. Steel lowered its price of credit sufficient to establish market power in credit and I can find no offer by petitioner of the necessary supplementary proof.

MR. JUSTICE FORTAS, with whom MR. JUSTICE STEWART joins, dissenting.

I share my Brother WHITE's inability to agree with the majority in this case, and, in general, I subscribe to his opinion. I add this separate statement of the reasons for my dissent.

The facts of this case are materially different from any tying case that this Court has heretofore decided. The tying doctrine originated in situations where the seller of product A offers it for sale only on the condition that the buyer also agree to buy product B from the seller. In *International Salt Co.* v. *United States*, 332 U. S. 392 (1947), for example, the company leased its patented machines on the condition that the lessee agree to use only International's salt products in the machines. In *Northern Pacific R. Co.* v. *United States*, 356 U. S. 1 (1958), the railroad leased land from its vast holdings on condition that the lessee accept "preferential routing" clauses compelling the lessee to ship on the

railroad's lines all commodities produced or manufactured on the land unless another railroad offered more favorable terms.

Although the tying doctrine originated under the specific language of § 3 of the Clayton Act, *Northern Pacific* was necessarily a Sherman Act case, because the Clayton Act provision applies only to "goods, wares, merchandise, machinery, supplies, or other commodities," and not to land. But *Northern Pacific*, in effect, applied the same standards to tying arrangements under the Sherman Act as under the Clayton Act, on the theory that the anticompetitive effect of a tie-in was such as to make the difference in language in the two statutes immaterial. The present case, like *Northern Pacific*, is also exclusively a Sherman Act proceeding. But, here, U. S. Steel is not selling or leasing land subject to an agreement that its prefabricated houses be used thereon. If these were the facts, and if U. S. Steel controlled enough land within an economically demarcated area or "market," however defined, the case might well be governed by *Northern Pacific*. But, here, U. S. Steel is not selling or providing land. It is selling prefabricated steel houses to be erected in a subdivision and it is providing financing for the land acquisition, improvement, development, and erection costs. Most of the financing is related not to the land cost but to the purchase and installation of the houses.

U. S. Steel neither owned nor controlled any of the land involved in the venture. On the contrary, the building lots constituting the subdivision on which the houses were to be built were owned by another company of which the principal owner was Mr. Fortner, who owned the petitioner. Nor is U. S. Steel selling credit in any general sense. The financing which it agrees to provide is solely and entirely ancillary to its sale of

houses. Under contract terms of a familiar sort in subdivision development, the credit advances are geared to progressive stages of the subdivision development and the purchase, erection, and resale of the houses.

U. S. Steel approached the petitioner seeking to sell it prefabricated steel houses to be erected on the land which Mr. Fortner's other company owned. In October 1960, after lengthy discussions, U. S. Steel offered, through its Credit Corporation, to lend petitioner about $2,000,000. This sum was to be secured by mortgages on the lots. The mortgage notes carried 6% interest, and petitioner also agreed to pay a "Service Fee" of ½ of 1% of the principal amount of the notes. Provisions were made to insure that the funds would be progressively advanced and used for land acquisition (from Mr. Fortner's other company), for development and improvement of the area preparatory to construction, and for the purchase and erection of the houses themselves. Petitioner was obligated to erect on each lot a prefabricated house manufactured by U. S. Steel. Of the total of about $2,000,000 to be advanced, $1,700,000 was to be disbursed against purchase and installation of the houses from U. S. Steel and the balance for land acquisition and development.

The Court holds that this was a "tying" agreement, and that, therefore, the extraordinarily onerous incidents of *per se* illegality which this Court has attached to "tying" agreements must apply here as well.

I cannot agree. This is a sale of a single product with the incidental provision of financing. It is not a sale of one product on condition that the buyer will not deal with competitors for another product or will buy the other product exclusively from the seller.

As my Brother WHITE shows, to treat the financing of the housing development as a "tying" product for the houses is to distort the doctrine and to depart from

the reason for its existence. Such an extension of the tying doctrine entirely departs from the factual pattern which is described in § 3 of the Clayton Act and which has been the basis of this Court's extension of the doctrine to the Sherman Act and its development of the rule that such tying arrangements are illegal on a *per se* basis—*i. e.,* without any showing that they constitute an unreasonable restraint of trade or tend to create a monopoly. The Court has established this rule because the kind of tying arrangement at issue in prior cases involved the use of a leverage position in the tying product—the patented machine, the copyrighted film, the unique land—to force the buyer to purchase the tied product. To apply this rule to a situation where the only "leverage" is a lower price for the article sold or more advantageous financing or credit terms for the article sold and for ancillary costs connected with the sale is to distort the doctrine, and, indeed, to convert it into an instrument which penalizes price competition for the article that is sold.

It is, of course, not inconceivable that a case might arise where § 1 or § 2 of the Sherman Act would outlaw a combination of sale and credit on a specific showing of market power and anticompetitive effect. It is also possible that such a combination might, in some situations, constitute "unfair methods of competition" in violation of § 5 of the Federal Trade Commission Act, or price discrimination or furnishing services on discriminatory terms, in violation of § 2 of the Clayton Act, as my Brother WHITE suggests. The majority, however, does not rely on any such analysis of the actualities of market power or anticompetitive effect, but sweeps this kind of credit arrangement within the *per se* ban.*

---

*The case is remanded for trial. I find it difficult to learn from the majority opinion just what is to be determined at that trial. Some parts of the discussion suggest that petitioner must establish

The effect of this novel extension—this distortion, as I view it—of the tying doctrine may be vast and destructive. It is common in our economy for a seller to extend financing to a distributor or franchisee to enable him to purchase and handle the seller's goods at retail, to rent retail facilities, to acquire fixtures or machinery for service to customers in connection with distribution of the seller's goods, or, as here, to prepare the land for and to acquire and erect the seller's houses for sale to the public. It is hardly conceivable, except for today's opinion of the Court, that extension of such credit as a part of a general sale transaction or distribution method could be regarded as a "tying" of the seller's goods to the credit, so that where the businessman receiving the credit agrees to handle the seller-lender's product, the arrangement is *per se* unlawful merely because the amount or terms of the credit were more favorable than could be obtained from banking institutions in the area. Arrangements of this sort run throughout the economy. They frequently,

that U. S. Steel had the market power over credit by showing facts in no way suggested at this stage by the pleadings. At another point the majority even suggests that if U. S. Steel can show "legitimate business purposes" and the absence of "competitive advantage" (*ante*, at 506) in the credit market, it will have made out a defense. But in an earlier part of the opinion, the majority says explicitly that "it is clear that petitioner raised questions of fact which, if proved at trial, would bring this tying arrangement within the scope of the *per se* doctrine." (*Ante*, at 500–501.) If it is this sentence which determines the range of issues open on remand there will be no examination at the trial of the business or economic background of the credit arrangements here attacked or of the effects, if any, of this arrangement on competition in the prefabricated house market. All petitioner will need to do is show that U. S. Steel did indeed condition the extension of its subsidiary's credit on an agreement to purchase U. S. Steel prefabricated houses and it will have demonstrated the automatic illegality of the credit arrangement.

and perhaps characteristically, represent an indispensable method of financing distributive and service trades, and not until today has it been held that they are tying arrangements and therefore *per se* unlawful. Cf. *Standard Oil Co. v. United States,* 337 U. S. 293, 315, 321 (1949) (separate opinion of DOUGLAS, J., and dissenting opinion of Jackson, J.).

In the present case in every respect, the provision of credit for construction of the houses and other associated costs of developing the subdivision, was, from U. S. Steel's point of view, ancillary and subordinated to the sale of the houses. The Credit Corporation did not operate at a loss, but its profit was comparatively low. Provision of special financing to the prospective purchaser of prefabricated houses by the Credit Corporation was intimately and exclusively related to the end object of the sale of the houses by the Homes Division. It was not a separate item of "sale."

This pattern is by no means limited to the provisions of financing, nor can the impact of the majority's opinion be so limited. Almost all modern selling involves providing some ancillary services in connection with making the sale—delivery, installation, supplying fixtures, servicing, training of the customer's personnel in use of the material sold, furnishing display material and sales aids, extension of credit. Customarily—indeed almost invariably—the seller offers these ancillary services only in connection with the sale of his own products, and they are often offered without cost or at bargain rates. It is possible that in some situations, such arrangements could be used to restrain competition or might have that effect, but to condemn them out-of-hand under the "tying" rubric, is, I suggest, to use the antitrust laws themselves as an instrument in restraint of competition.

For these reasons, I dissent.