**BREAUX BROTHERS FARMS, INC.**

**v.**

**TECHE SUGAR COMPANY, INC.**
**and South Coast Sugars, Inc.**

**Civ. A. No. 90–2536.**

United States District Court,
W.D. Louisiana,
Lafayette–Opelousas Division.

May 14, 1992.

Claude F. Reynaud, Jr., Breazeale, Sachese & Wilson, Baton Rouge, Raymond E. Allain, Sr., Allain & Allain, Jeanerette, for Breaux Bros. Farms, Inc., Teche Planting Co., Inc. and Francis "Pat" Accardo.

Sidney A. Marchand, Talbot, Sotile, Carmouche, Marchand & Marcello, Donaldson, for defendants, Teche Sugar Co., Inc. and South Coast Sugars, Inc.

## MEMORANDUM OPINION

DOHERTY, District Judge.

### FACTUAL NARRATIVE

This action challenges the legality of a five-year lease of sugar cane farm land offered by defendant Teche Sugar Company, Inc. to the three plaintiff farmers. As a condition of farming the land, the lease requires plaintiffs to take their sugar cane to the mill designated by defendant. Plaintiffs say this illegally ties the leasing of farm land to the use of designated sugar mills in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs seek actual damages caused by the illegal tie, trebled, costs and attorneys fees. Two plaintiffs have brought state-law claims for expenses incurred through preservation work done on defendant's land.

For the reasons set forth below, the Court finds that the lease offered by defendants is an illegal tying arrangement which violates federal antitrust law.

### THE PARTIES

Plaintiffs are two agricultural corporations and an individual farmer, all of whom originally farmed land in St. Mary Parish under leases with Prudential Insurance Company, the land owner. Prudential thereafter negotiated the right to lease this land to Teche Sugar under a "master lease" forcing the farmers to renew their leases with Teche Sugar. Teche Sugar interjected a mill designation provision in the leases.

Breaux Brothers Farms, Inc. ("Breaux Brothers") is a Louisiana corporation owned by Herbert Breaux. It alone actually executed a new lease (containing the designated mill provision) with Teche Sugar.

Teche Planting, Inc. ("Teche Planting") is a Louisiana corporation owned by Donald and Larry Chauvin, two brothers. It also farmed land owned by Prudential but refused to sign a lease with Teche Sugar in 1990, and ceased farming that land. Teche Planting had other land under lease which it continued to farm.

Francis "Pat" Accardo ("Accardo") is an individual, unincorporated farmer who farmed under a lease with Prudential, and who refused to sign a new lease with Teche Sugar. He left the land, ceased farming for one year, and then began farming a tract of land which Accardo argues is smaller and less productive than the Prudential tract.

Teche Sugar Company ("Teche Sugar") and South Coast Sugars, Inc. ("South Coast") are sister companies who are defendants in this matter.[1] Teche Sugar was the owner of the Oaklawn Mill, which was located on the same Prudential estate which certain plaintiffs were farming. South Coast was the owner of the Raceland Sugar Mill, located in Raceland, Louisiana,[2] approximately 72 miles from the plaintiffs' farms.

### BACKGROUND

Sugar cane farmers, sugar mills, and farmland are an interdependent triangle. Farmers cannot market their crop except through a mill which turns the cane into a

---

[1] Both defendants are wholly owned subsidiaries of South Louisiana Sugar, Inc., which in turn is owned by South Coast Investment Company. Caneland, Inc. also a wholly owned subsidiary of Teche Sugar Company, Inc., and also executed master leases with landowners and subleases containing designated mill provisions with farmers.

[2] Raceland Sugar Mill is the wholly owned subsidiary of Teche Sugar as well.

usable commodity. The mills, in turn, require raw materials from the farmer. The farmer requires land to produce his crop; because land is available in only finite quantities, farmers' sources of land are necessarily limited.

When sugar prices are good, more sugar cane is grown and land becomes more desirable. More crops mean a greater demand for mill services. Conversely, when sugar prices are low, or lower than other crops such as rice or soybeans, the amount of sugar cane produced decreases, along with the demand for mill services. Sugar cane farm land, in turn, is less desirable; therefore, more available.

As sugar mills face large initial fixed costs, mill owners seek a constant supply of sugar cane each grinding season, and therefore, attempt to shield themselves from fluctuations in crop production levels. To ensure a constant supply of cane, mill owners have, at various times, purchased and farmed unused land themselves, negotiated with farmers to bring their cane to their mill and, in the present case, defendants purchased the right to lease farm land under "Master Leases" so that, by controlling the land, defendants can control the farmer's decision of which mill to use.

Initially, Teche Sugar conceived of the "master lease" arrangement in order to ensure a reliable source of sugar cane for its Oaklawn Mill. This mill was located on the plantation on which certain plaintiffs farmed. By interjecting themselves between the land owner, Prudential, and the farmer, Teche Sugar hoped to stabilize the supply of sugar cane to its mill and thereby stabilize its income, thus making the Oaklawn Mill profitable. It was willing to pay more rent to Prudential than it would charge the farmer in order to gain this steady supply, thus creating a loss.

Teche Sugar planned to make up these losses through its sugar mill operations, and therefore added a requirement to each lease that each farmer take all of the cane

produced on that land to a sugar mill to be designated by Teche Sugar. In order to continue farming the land, the farmer would have to accept the designated mill provision. It is this that plaintiffs label an illegal tie and which is the subject of this lawsuit.

However, Teche Sugar closed the Oaklawn Mill following the 1989 grinding season, after the "master lease" was executed but before the "master lease" expired. Nonetheless, Teche Sugar kept to its original plan, and simply designated the Raceland Sugar Mill, owned by South Coast, as the mill to which Breaux Brothers and its other sublessees must take their cane.[3]

The Raceland mill, in turn, was sold in 1991 after the execution of the "master lease" but before it expired. Thereafter, Teche Sugar was left with the power to designate the sugar mill, but with no mill to support. Rather than delete this provision, Teche Sugar entered into an agreement with Sterling Sugar Mill, whereby it agreed to pay Sterling a flat $9.00 per ton to grind the cane diverted to Sterling's mill via the designated mill provision. Therefore, Teche Sugar made a profit which was the difference between the price obtained by the mill for the sugar when sold and the $9.00 per ton rate it paid Sterling. This was approximately a $4 to $6 per ton profit in 1990. Teche Sugar used this money, in part, to cover the losses it was incurring in paying more rent to Prudential than it collected from the farmers.

At least 225,000 tons of sugar cane were delivered in 1990 to either the Raceland or Sterling mills as a result of the designated mill provisions contained in the subleases offered by Teche Sugar and/or South Coast. This "designated" cane had a total approximate value of more than $9 million, and resulted directly from "master leases" executed by either Teche Sugar or South Coast and landowners.

Teche Planting and Accardo refused to sign the lease containing the designated

---

**3.** Before the 1990 grinding season ended, however, Teche Sugar agreed to allow some of Breaux Brothers' cane to be taken to the nearby Sterling mill because the Raceland mill was unable to grind the cane quickly enough to allow the Breaux Brothers to get its entire crop out of the field timely.

mill provision, and left the land at Oaklawn Plantation. However, they found it difficult to replace the farm land they had rejected, and neither party farmed in 1990. Accardo ultimately found land in the area and resumed farming; Teche Planting did not replace the acreage lost.

Each farmer preferred to farm near his home, ideally no more than three to five miles away, therefore, both looked (unsuccessfully) in St. Mary Parish and/or the border of Iberia Parish for land. In 1991 Accardo eventually found land in St. Mary Parish but argues it was of smaller acreage and less productive than the land at Oaklawn Plantation.

Faced with the choice of losing its leased land, Breaux Brothers objected to the designated mill provision, but ultimately entered into a lease with Teche Sugar. However, this meant Breaux Brothers was deprived of the opportunity to negotiate its own terms with the mill of its choosing.

The selection of a mill is determined, at least in part, by distance. Farmers, including plaintiffs, testified their costs were reduced when the mill was nearby, even though mills reimburse farmers for most, if not all, of the direct transportation costs.

The distance between the farm and the mill dictates, in large part, whether the cane is hauled by tractor or is transloaded by truck. The method of hauling sugar cane and the payment made for the different methods are also important factors in the choice of a mill. Hauling by tractor is the traditional method of taking cane to the mill, but it is economically feasible only when the mill is five plus miles from the farm. Tractors arguably are a less safe method of hauling as they move slowly, create road hazards for the general public, and the carts are prone to tip over. Mills pay a hauling fee to the farmers when the farmers haul the cane by tractor; the farmer provides the tractors, carts and manpower involved.

Transloading is generally thought to be a safer but more expensive method of hauling. In order to transload, farmers who have not transloaded before are required to purchase additional equipment. Under certain circumstances this equipment is furnished by the mill; Raceland furnished transloading equipment to Breaux Brothers for use during the 1990 grinding season.[4] The mills traditionally pay a transloading fee to the farmer; in gross amount, the amount paid is less than the tractor hauling fee.

Other factors in the choice of a mill include less identifiable costs, such as the amount of work time lost because of slow turn around unloading cane at the mill, mill efficiency or inefficiency, the mill's payment record and timing of payment and its effect on the farmer's cash flow, and incentives offered the farmers to obtain their business. Subjective criteria, such as loyalty to a mill, personal relationships with employees and managers of a mill, and the mill's willingness to assist the farmer through difficult times are also factored into a farmer's decision to select a given mill.

Mills buy the cane from the farmer for a certain percentage of the crop, and pay the amounts owed to the farmer on a staggered schedule. Although the percentage paid is rather standard in the industry, the timetable of payment varies. The timing varies the profits of the farm, as most farmers operate on borrowed money. The sooner the farmer can retire the debt, the sooner he can stop paying interest.

There are five area mills in the St. Mary/Iberia Parish area. Sterling is one of the five mills and the only private mill in St. Mary Parish. St. Mary Co-op is a cooperative mill in St. Mary Parish owned by the farmers. There are three mills in Iberia Parish, two co-op mills (owned by the farmers) and one private. Each mill, whether private or co-op, seeks to attract farmers from approximately a 25-mile radius, although cane is on rare occasion brought in from greater distances. Transporting cane beyond 25 miles becomes eco-

---

**4.** This reimbursement was not part of the original lease negotiation, however, and reimbursement was not offered to Teche Planting or Accardo.

nomically unsound except under the most unusual circumstances.

Teche Sugar, South Coast and its related companies,[5] according to uncontradicted testimony, controlled no more than 17.5 percent of the sugar cane farmland in St. Mary Parish at any time in the past five years. The percentage is reduced to no more than 9.4 percent if the geographic market is expanded to include St. Mary and Iberia Parishes.

The farmers who replaced Teche Planting and Accardo on the Teche Sugar/Prudential leases traveled from Iberia to St. Mary Parish, and farmed land in both parishes. Indeed, there were many farmers who commuted to the land they farmed, one as far away as 44 miles, and many from 25 to 30 miles away.

These farmers who commuted testified they, too, would have preferred to live closer, but there was no indication that the practice of farming created any hardship that commuters in other professions did not also face. Clearly, it is economically feasible to commute at least 25 to 30 miles from home to farm, as many farmers are so doing.

## LEGAL ANALYSIS

The matter which is before this Court is whether or not the contracts entered into between defendants and plaintiffs and in particular the portions of those contracts requiring plaintiffs to surrender to defendants their rights to select the mill to process their sugar cane to defendants is a tying agreement and whether or not that tying agreement is in violation of the Sherman Anti-trust Act 15 U.S.C. §§ 1, 2. Because the issue before this Court has such broad and potentially lasting effect and impact and because the facts do not lend themselves to specific analysis under any one case, this Court has reviewed the historical development of jurisprudence dealing with Sherman Anti-trust violations and in particular, "tying" violations.

The Sherman Anti-trust and anti-trust legislation in general has been subject to

numerous Supreme Court opinions ranging from *Chicago Board of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918) to *Jefferson Parish Hospital District No. 2, et al. v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 decided in 1984. Circuit court decisions dealing with this issue throughout the same historical period and post-dating the *Jefferson Parish* decision have been reviewed as well. In 1958, the U.S. Supreme Court explained the purpose of the Anti-trust Act in *Northern Pacific Railway Co. v. United States of America*, 356 U.S. 1, at 4, 78 S.Ct. 514, at 517, 2 L.Ed.2d 545 (1958).

> "The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade ... the policy unequivocally laid down by the Act is competition. And to this end it prohibits 'every contract, combination ... or conspiracy, in restraint of trade or commerce among the several States.' Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which 'unreasonably' restrain competition."

Later, in *Fortner Enterprises, Inc. v. United States*, 394 U.S. 495, 502, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969), the Court elaborated upon its view of the policy behind the Sherman Act noting that:

> "As the special provision awarding treble damages to successful plaintiffs illustrates, Congress has encouraged private anti-trust litigation not merely to compensate those who have been directly injured but also to vindicate the important public interest in *free competition*." (emphasis added)

The facts before this Court do not require an exhaustive analysis of the entirety of the Sherman Anti-trust Act, rather, at issue in this case is the validity of a specific contract entered into between defendants and plaintiffs which contains language agreed to be a "tying agreement." Therefore, this Court must decide whether or not the contract and its alleged tying provision

**5.** See note 1.

give rise to a per se violation of § 1 of the Sherman Act, i.e., whether a contract that requires the farmers who lease the land to abdicate their right to select the market for their sugar cane is a per se violation of the Sherman Anti-trust Act, and if not, whether the contract is nevertheless illegal because it unreasonably restrains competition under a Rule of Reason analysis.

■ The Supreme Court in its historical development of jurisprudence on tying and per se violations has noted that there are certain agreements and practices which because of their pernicious effect on competition and lack of any redeeming virtue, are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. Citing *Northern Pacific*, 356 U.S. at 5, 78 S.Ct. at 518. Tying agreements are unreasonable in and of themselves "when a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a 'not insubstantial' amount of interstate commerce is affected." *Northern Pacific*, 356 U.S. at 6, 78 S.Ct. at 518. "Of course, where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most." *Id.*, at 6–7, 78 S.Ct. at 519.

Some 25 years later in *Jefferson Parish, supra* the Court reviewed its jurisprudential history of this issue by saying "Our cases have concluded that the essential characteristic of an invalid tying agreement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and the Sherman Act is violated." *Id.* 466 U.S. at 12, 104 S.Ct. at 1558. The Court continues, citing *Times–Picayune Publishing v.*

*United States*, 345 U.S. 594, 605, 73 S.Ct. 872, 878, 97 L.Ed. 1277 (1953) "... conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market." The Supreme Court has specifically defined tying as "... an agreement by a party to sell one product but only on the condition that the buyer also purchase a different (or tied) product or at least agrees that he will not purchase that product from any other supplier." *Northern Pacific*, 356 U.S. at 5–6, 78 S.Ct. at 518. When dealing with tying, competitors are denied "free access to the market for their tied products not because the party imposing the tying requirements has a better product or lower price, but because of its power or leverage in another market." *Northern Pacific*, 356 U.S. at 6, 78 S.Ct. at 518. "At the same time buyers are forced to forego their free choice between competing products. For these reasons 'tying agreements fare harshly' under the laws forbidding restraints of trade." *Northern Pacific*, 356 U.S. at 6, 78 S.Ct. at 518.

In the Supreme Court's most recent ruling on the matter, the Court defines the issue as; "The answer to the question of whether petitioners have utilized a [illegal] tying arrangement must be based on whether there is a possibility that the economic effect of the arrangement is that condemned by the rule against tying—that petitioners *have foreclosed competition on the merits in a product market distinct from the market for the tying item.*" (emphasis added) *Jefferson Parish, supra*, 466 U.S. at 21, 104 S.Ct. at 1563. The Court notes that the per se rule against tying can be coherent only if tying is defined by reference to the *economic effect of the arrangement* as the Sherman Act does not prohibit *tying*, rather it prohibits *contracts in restraint of trade* thus, in a sense, the question of whether tying is involved is beside the point. *Jefferson Parish*, 466 U.S. at 21, n. 33, 104 S.Ct. at 1563, n. 33.

The Supreme Court has declared the policy behind the Sherman Anti-trust Act to be an attempt to *identify* and *control* tie-ins which have *demonstrable exclusionary impact* on the *tied market* or *abet harmful exercise of market power. Jefferson Parish*, 466 U.S. at 35, 104 S.Ct. at 1570 (O'Connor, J., concurring).

■ Therefore, to establish that a tying provision is a per se violation, one must show that the tying agreement exists, that it is unreasonable in and of itself because of the pernicious effect on competition, i.e., a demonstrable exclusionary impact on the tied market or abetting harmful exercise of market power, and a lack of any redeeming virtue.

■ Here there is no doubt and it is not contested by either party that the provision of the contract at issue is a tying arrangement; therefore, one must move to the next level of inquiry and establish that sufficient control over the tying market exists to have the necessary pernicious effect. Inherent in this inquiry is a definition of the *market* or markets involved. The Supreme Court noted in *Jefferson Parish* that any inquiry into the validity of a tying agreement must focus on the *market or markets in which the two products are sold* for that is where the anti-competitive forcing has its impact. There must be a demonstration of sufficient control over the *tying market* to appreciably restrain free competition in the *tied market*, i.e., a demonstration that the seller can force the purchaser to buy tied products they do not want or want on substantially different terms and that not an insubstantial amount of interstate trade is affected. Bottom line, plaintiffs must establish that the tying is economically harmful because the power and the market for the tying product has been used to create *additional power* in the tied market. *Jefferson Parish*, 466 U.S. at 36, 104 S.Ct. at 1570 (O'Connor, J., concurring).

In *Jefferson Parish* the Court's analysis of market within the tying issue focused on the hospital's sale of services to its patients rather than its contractual agreements with the providers of the anesthesiological services. In *U.S. v. Philadelphia National Bank*, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), at 357, 83 S.Ct. at 1738, the Court outlined the market inquiry as "The proper question to be asked in this case is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, *the effect of the merger on competition will be direct and immediate.*" (emphasis added) Therefore, "the area of effective competition in the known line of commerce must be charted by careful selection of the market area in which the seller operates, and *to which the purchaser can practicably turn for supplies.*" (emphasis in original) *Id.* at 359, 83 S.Ct. at 1739. The Congressional intent in defining market was explained by the Supreme Court in *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), at 336, 82 S.Ct. at 1529 under an analysis within the Clayton Act—which has been deemed to be the same under the Sherman Act—"Congress prescribed a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both 'correspond to the *commercial realities*' of the industry and be *economically significant.* Thus, although the geographic market in some instances may encompass the entire nation, under other circumstances it may be as small as a single metropolitan area." (emphasis added)

■ Plaintiffs argued that the relevant market for the tying product is St. Mary Parish; defendants argued ably that the market should be defined broader than St. Mary Parish. Plaintiffs argue St. Mary Parish defines the market for land because farmers need to live near, i.e. three to five miles from the land on which they farm and all plaintiffs reside in St. Mary Parish. However, the record is replete with testimony from farmers who commute to the land they farm, some from as far away as 44 miles with several who testified they commute 25 to 30 miles to farm, *crossing the St. Mary/Iberia Parish lines.* Although the farmers testified they did not

*want* to commute, the clear testimony showed that the practical realities of the farming industry today is that farmers *do commute* to their land.

Plaintiffs proved that farmers *desire* to live on the land they farm or no more than 3 to 5 miles from their land; however, plaintiffs did not prove that it is *necessary* under the *commercial realities* of the industry for farmers to live 3–5 miles from their land. It was established by evidence presented that sugar cane farmers must farm land in an area which can be serviced by operating sugar cane mills. It does not seem reasonable to this Court that the definition of the relevant market as to the tying product should be defined by the buyers' *preferences,* i.e., in this case, the farmers' *preference* —rather than any economic necessity or commercial reality of the industry. Each of the reasons given by the farmers and the expert brought by plaintiffs to bolster the farmers' arguments are reasons applicable to anyone who works and in particular, anyone who owns a business, i.e., a store, restaurant, etc. It is certainly *preferable* that one live near the location of his business so that he can minimize the transportation costs required to travel to and from work and deal with vandalism, problems on site with equipment and/or the building, problems with the weather when the weather threatens the building, structure and/or business. Anyone would *prefer* to live in close proximity to where they work in order to minimize transportation costs and inconvenience. However, this Court did not hear sufficient credible evidence to establish any unique requirements of the farming industry that would establish a *commercial reality* of the farming industry which *necessitates* the farmers living within five miles of the farm. This Court finds no jurisprudence which convinces it the *preference of* the buyers, i.e., the farmers in this matter, should define the relevant market for the tying product.

Rather, this Court finds the jurisprudence establishes that the *commercial realities* of the sugar cane industry, the *competitive area* involved and the *economic significance* should dominate the definition of the market. It was established by evidence presented that sugar cane farmers must farm land in an area which can be serviced by operating sugar cane mills. Based upon the more credible evidence presented, particularly by the farmers and sugar mill operators, this Court finds the area within reasonable transporting distance to the local sugar cane mills to be the relevant geographic market in the tying product. Land has reduced, if any value for growing sugar cane if the cane grown on that land cannot be processed by a mill or if transportation costs required to get the cane to the mill are so great as to destroy any profit for the farmer or the mill. Evidence showed that there are five operating sugar mills in and around the St. Mary/Iberia Parish area and sugar cane can be transported 25 to 35 miles and still remain an economically sound practice. (Brandon Bates of the St. Mary Co-op testified to this as did Fred Clark, vice-president of Sterling Mills.) Consequently, the market area in which the seller, i.e., the master lessor, operates, i.e., leases land which is desirable as sugar cane land, is the area within reasonable transport distance of the local sugar mills. Further, sugar cane mills cannot operate without a steady source of sugar cane to the mill. Therefore, the area to which the farmers can practicably turn for *mill services* is the area where mills can effectively operate, i.e., where there is a cane supply to mill and where land exists which can be farmed for sugar cane. The area to which the farmers can practicably turn for *land* to farm is the same geographic area, i.e., the area where mills operate, for one must have a *mill* which can service the cane grown on the land—the five local sugar mills provide that service. Consequently, the area including the reasonable, economically practical transport distance to these mills is found to define the geographic limits of the markets. Although this Court does not doubt that the farmers would *prefer* to live on or within five miles of their farm, the relevant and credible evidence presented demonstrated no unique characteristics of farming which would *re-*

*quire* the farmers live in closer proximity to their land than the defined market. However, the evidence firmly establishes the interdependency of the farmer and the mills and the economic reality of the industry which defines the markets involved.

Plaintiffs must establish that defendants had sufficient control over the *tying market* so as to appreciably restrain free competition in the *tied market. Northern Pacific*, 356 U.S. at 6, 78 S.Ct. at 518. Therefore, one must also define the "tied market." Although it is clear that the geographic market in the tied and tying products need not *necessarily* be the same, *Jefferson Parish*, 466 U.S. at 29, 104 S.Ct. at 1567, this Court finds that because of the commercial realities of the sugar cane industry and the unique relationship between the production of sugar cane and the milling of that cane, the geographic markets for the *tied* and *tying* products are the same. Sugar mills cannot survive without a stable supply of sugar cane to mill; sugar cane land loses part or all of its value if there is no mill which can economically mill the cane. The two are interdependent. Therefore, the geographic markets are the same.

Next, this Court must determine if defendants had sufficient control over the tying market to appreciably restrain free competition in the tied market. Within the tying market it is clear from the evidence produced that even if this Court were to accept the plaintiffs' argument that only St. Mary Parish is the relevant geographic market, defendants and their related companies *do not* have control over a sufficient amount of property so as to meet the standard set forth in *Jefferson Parish, supra.* There, the Court found that control over *30% of the market* was not sufficient; in this matter, reviewing *all facts in a light most favorable to the plaintiffs*, defendants *do not control* 30% of the available sugar cane land *even in St. Mary Parish.* However, the inquiry does not stop there. Plaintiffs argue land, by its nature reduces the requisite burden in showing market power. Support for this argument is found in the seminal cases of *Northern Pacific Railway*, 356 U.S. 1, 78 S.Ct. 514, 2

L.Ed.2d 545 (1958), *Fortner*, 394 U.S. 495 at 503, 89 S.Ct. 1252 at 1258 and *Jefferson Parish, supra.*

■ *Northern Pacific Railway*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) and following cases established that control of certain *unique types of land* can, by the nature of the product involved, create the necessary special ability or *market power.* However, this Court is convinced from a review of the jurisprudence that control of *land* in and of itself does not grant that special ability/market power. Rather, the land involved must be *unique* as in *Northern Pacific Railway* where the land was contiguous to the railroad. A strong argument can be made that large contiguous tracts of sugar cane land within practical transport distance of operating mills are unique and evidence was presented to support this argument. However, to limit the focus of inquiry to this narrow issue without evaluating the underlying rationale and policy would be short sighted. Clearly, the true inquiry is the broader question of whether or not sufficient control or power exists in the market to *manipulate* economic markets and the working of *competition* therein.

■ In *Jefferson Parish, supra* the Court cited *Northern Pacific Railway* where the railroad controlled vast tracts of western real estate located contiguous to the railway noting this gave the railroad a unique kind of *bargaining power* that enabled it to tie the sales of that land to exclusive long term commitment contracts and thereby fenced out *competition* in the transportation market. The particular land involved was often prized by those who purchased or leased it and was frequently essential to their business activities. *Jefferson Parish, supra*, 466 U.S. at 17, 104 S.Ct. at 1560 citing *Northern Pacific Railway.* The land before this Court, i.e., large contiguous tracts of sugar cane farm land, is also prized by those who lease it and is essential to the business of sugar cane growing. The "preferential routing" clauses, i.e., tying agreements in *Northern Pacific Railway* conferred no benefit on the

purchasers or lessees of the land; the tying agreement before this Court confers no benefit on the purchasers or lessees, i.e., the farmers. While the lessees or purchasers in *Northern Pacific Railway* obtained the land they desired they yielded their freedom to deal with competing carriers in order to do so; defendants in that case made no claim that the land came any cheaper than if the restricted clauses had been omitted. Here, the farmers could have obtained or did obtain the farm land they desired, but did so by yielding their freedom to deal with competing mills; defendants made no claim that the land came any cheaper to the farmers than if the restricted tying agreement had been omitted. The major distinction between *Northern Pacific Railroad, supra* and the matter at hand is the *purpose* for the restrictive agreement. In *Northern Pacific* the railroad's purpose was to fence out competitors, i.e., to stifle competition. Here, evidence showed the *original* purpose of the tying agreement was to provide a stable and secure cane supply to defendants' Oaklawn Mill and once Oaklawn closed, to provide a profit base for their Raceland Mill until Raceland was sold and thereafter to provide an income stream to service the illusory land lease contracts entered into in order to capture the cane. Defendants no longer own or operate any sugar cane mill—Oaklawn closed in January, 1990; Raceland was sold in late 1991. However, the tying agreements still exist and are the subject of a *tolling agreement* with Sterling Mill, i.e., Teche Sugar pays a flat fee to Sterling for each ton of cane delivered by defendants, a delivery made possible by the Master Leases. Sterling then pays Teche Sugar the amount of money Sterling normally receives as its profit for grinding the sugar. This difference between the flat rate and the mill's normal profit is the "bounty" which Teche Sugar receives from its control over the sugar cane. Therefore, the purpose of defendants' tying agreement is no longer to secure a stable supply of cane for *their mills*, but rather to secure funds to offset the loss created by their contracts.

Defendants entered into contracts with the land owners paying an *above market rate* for land to lease and subleased the land to farmers at the *market rate*, thus creating an illusory result. However, defendants anticipated recouping this loss from profit made in their sugar mills from the processing of the cane they controlled through the tying agreements. Once the Oaklawn Mill was closed and the Raceland Mill sold, defendants were left with the land leases requiring them to pay an above market rate to the land owners and their land leases to the farmers which charged only the market rate; therefore, defendants were left with a loss. It is this loss defendants attempt to recoup through the tolling agreements. Consequently, once Oaklawn was closed and Raceland was sold, defendants did not release the cane from the tying agreements, rather, took that dedicated cane and marketed it to the Sterling Mill for a bounty of $9.00 per ton for cane delivered. Clearly, the purpose for the continued existence of the tying agreements is to service defendants' contractual obligations.

Defendants created an artificial market by interjecting themselves between the land owner and the farmer, manipulating the price of lease land, substituting themselves for the farmer in dealing with the mills as to dedicated cane. By so doing, whether intended or not, defendants have not only *manipulated* competition in the tied market but have effectively *eliminated* competition among the mills as to the dedicated cane. By manipulating the leasing of land, i.e., the tying market, the defendants have completely usurped the market as to the mills and the mill's consumers, the farmers, i.e., the tied market and thereby created market power in a market where they had none. The present arrangement completely strips the consumer, i.e., the farmers of their access to their market, i.e., their ability to sell the crop they produce to the mill of their choice and thereby completely insulates the mills from the beneficial stress of competition.

Sugar cane farming is unique as the farmers can only market their cane through a mill—mills are their market—

and mills can only process sugar cane; the producers of that cane heretofore have been their consumers. Under the present circumstances, an entire market and *the competition* within that market vis a vis the farmers, has been destroyed. As long as the bounty is paid to the master lessors by the contracting sugar mill, the sugar mill need not be responsive to the needs and desires of the consumer of their services, i.e., the farmers. This will act to insulate the mills from the beneficial effects of competition and could perpetuate inferior practices within the mill or insulate an inferior mill from the beneficial effects of competition altogether. In other words, under the existing system a mill could be very inefficient, could exploit the farmer on the price to be paid for the cane and the time table for payment, (quite an important factor for farmers who borrow the money to plant and harvest their crop) and could place whatever conditions it wishes upon the farmer as to the milling of the cane and the *farmer would have no recourse* and/or no power within the market to counter. Competition in the tied market among the mills as to the consumer, i.e., the farmer and his product, has been destroyed. As to those farmers subject to tying agreements, all power in the tied market is now held by the master lessor who prior to the master lease *had no power* therein.

As long as the master lessor obtains his bounty there is no reason for him to have further interaction with the mill or for the mill to be sensitive to the consumer's, i.e., the farmer's needs. Further, the artificial bounty paid by the mill must be accounted for in the market in some manner. Fred Clark, vice-president of Sterling Mills, testified the bounty paid by his mill to the master lessors increases the sale price of the milled sugar. Although defendants argue the intricate regulatory scheme controlling sugar should preclude such an effect on the market, this argument is in direct contradiction to the very credible testimony of the vice-president of Sterling Mills, i.e., one who has direct knowledge as to how the $9.00 bounty is being handled by his mill and one who has no direct stake in this litigation. Consequently, whether initially intended or not, the end result of the master lease and subsequent tolling agreement, is to create an artificially inflated market in the tying market, destroy competition in the tied market among the mills as to the consumer of the services provided, i.e., the farmers, insulate the mills from their own inefficiency, and increase the cost of milled sugar to the ultimate sugar consumer. In return the only *potential* benefit of the arrangement is to the land owner through the artificially high price paid for the lease and to the defendants through recoupment of the loss created by their own contracts and decision to close Oaklawn and sell Raceland *before their* master leases had expired thereby removing their opportunity to recoup their loss through profits made by their mill grinding the dedicated cane. This result in no way increases the stability of the mills, land or sugar cane markets. It artificially increases the cost of the sugar cane land, thereby increasing the cost of production. It does not benefit the mill to which the cane is dedicated, per the testimony of Mr. Clark, vice-president of Sterling Mills; it increases the cost of milled sugar and creates an environment conducive to driving out competing mills and making it more difficult for new mills to enter the market and/or competing mills to expand. Therefore, the tying arrangement as it exists today, has no legitimate business purpose other than to protect defendants from the effect of their own business decisions. Any possible argument of benefit, as a stable source of cane is provided to the selected mill, has been defeated by testimony by Sterling sugar's vice president who testified no benefit was created. Further, the same result can be accomplished in a less restrictive manner, i.e.—through agreements made *directly with* the consumer/farmer. Testimony was presented that such agreements did and do exist. These agreements can provide the needed stability of a cane source for the mills and still maintain the beneficial stresses of competition. Therefore, the tying provision as it exists results in an appreciable restraint on competition—it destroys it all together as between the mill and its con-

sumer, i.e., the farmer and provides no benefit to society.

Under the evidence presented, this Court found nothing which would prohibit the defendants, or other parties, from sustaining and/or manipulating the artificial market created by defendants, i.e., from obtaining master leases on additional acreage as it becomes available, paying the artificially high market price to the land owner for that land, subleasing the land to farmers for market value or an even higher premium, requiring the tying provision, and entering into tolling agreements with existing mills for a bounty. Although there was limited testimony that defendants might not increase their land holdings, there was not sufficient credible evidence presented to this Court to convince it that the practice by defendants or others would not continue or expand. Nonetheless, this begs the question. Whether or not a situation which has the *potential* to completely eliminate an existing competitive market and substitute an artificial non-responsive market with parties who otherwise would have no power within that market should exist under the law is the better question.

The Court in *Fortner, supra,* 394 U.S. at 503, 89 S.Ct. at 1258, keyed to the *lack of legitimate business purpose* which could not be achieved in some less restrictive way and the presence of appreciable restraint on competition. *Fortner, supra* at 503, 89 S.Ct. at 1258, establishes that market power, can be inferred from the "tying market's desirability to the consumer or from uniqueness in its attributes" and that "economic power over the tying product can be sufficient even though the power falls short of dominance and even though the power exists only with respect to some of the buyers in the market." "Such appreciable restraint results whenever the seller can exert *some power* over *some of the buyers* in the market, even if this power is not complete over them and over all other buyers .."

Consequently, not only is the question whether or not the defendants had sufficient power within the defined market to force or to make forcing of farmers proba-

ble, or if such economic power can be inferred by the product's desirability to consumers and its uniqueness, but more importantly, the inquiry is whether or not the tying arrangement has a legitimate business purpose which could not have been achieved in some less restrictive way and if the tying arrangement results in an appreciable restraint on competition.

The testimony of each of the plaintiffs and several farmers who were brought as witnesses clearly show that the defendants had sufficient power to impose the tying arrangement with respect to at least certain buyers within the market; therefore, an inference of some special economic power in the market might be made. The Court in *Fortner, supra* noted that "Since in a freely competitive situation buyers would not accept a tying agreement obligating them to buy a tied product at a higher price than the going market rate, this substantial price deferential with respect to the tied product (pre-fabricated houses) in itself may suggest that respondents had some special economic power in the credit market." Here the testimony clearly establishes that given their choice, farmers would not accept a tying agreement obligating their cane to a specific mill. However, in order to lease the large contiguous tracts of sugar cane land which become available only cyclically, they accepted the tie or left the land. This acceptance of the tying provision and/or withdrawal from the market suggests some special ability or market power on behalf of the Master Lessors. However, the question still remains whether or not sufficient power existed to force this on an appreciable number of buyers within the relevant market. As noted, the Court in *Fortner, supra* refused to key to the number involved, rather, keyed to the *effect on economic competition.* "Application of the per se rule focuses on the *probability* of anti-competitive consequences." *Jefferson Parish, supra,* 466 U.S. at 15–16, 104 S.Ct. at 1560 (emphasis added) "The same strict rule is appropriate in other situations in which the existence of market power is *probable." Jefferson Parish, supra* at 17, 104 S.Ct. at 1560 (emphasis added) "When

the seller's share of the market is high [citing *Times–Picayune, supra*] or when the seller offers a unique product that competitors are not able to offer, [citing *Fortner 1, supra*] the Court has held that the *likelihood* that market power exists and is being used to restrain competition in a separate market is sufficient to make a per se condemnation appropriate." *Jefferson Parish*, 466 U.S. at 17, 104 S.Ct. at 1560.

It is clear from the more credible evidence presented that forcing is not only probable but exists as to the land controlled; therefore, as the amount of land controlled increases so does the potential for forcing. If this situation is allowed under the law it presents an open invitation to the defendants, third parties or the land owner to further manipulate the markets, i.e., to insert a tying arrangement and then sell the dedicated cane to mills and again eliminate competition among the mills for the consumer. However, in order for forcing to be found even as probable, the buyer must be forced to buy a product he does not want or would have bought on different terms.

Defendants presented evidence that the Sterling Mill is now the designated mill of defendants and plaintiffs, in all probability, would have sent their cane to the Sterling Mill notwithstanding the tie, therefore, forcing is not occurring. However, this begs the question as to whether or not the plaintiffs would have preferred the product, i.e., mill services, on *different terms*, i.e., terms they had negotiated and/or agreed to with the mill, their having been free to bargain with the mill and select the mill based upon their own criteria rather than having the mill and all related conditions forced upon them. The jurisprudence defining forcing makes it clear that forcing occurs when the buyer is forced to buy a product he does not want or to buy it elsewhere *on terms he would not otherwise accept;* testimony was clear among the farmers that sending their cane to the Raceland Mill clearly was a product, i.e., milling service of Raceland, they did not want. Testimony was also clear that after Raceland closed accepting the Sterling Mill with no opportunity to evaluate the many criteria involved in the selection of a mill is acceptance of a product on terms they would not otherwise accept. Therefore, clearly forcing did occur.

However, this does not complete this level of the inquiry. A not insubstantial amount of interstate trade must be effected and there must be two separate products for a per se violation to exist. It is without question two separate products are being sold. Land is being leased and the service of milling sugar cane is being sold. Therefore, the next inquiry is whether or "not an insubstantial" amount of commerce has been involved. The Supreme Court requires as a threshold matter that there be a substantial potential for economically significant impact on competition in order to justify per se condemnation. If only a single purchaser were forced with respect to the purchase of a tied item the resultant impact on competition would not be sufficient to warrant the concern of the antitrust law. It is for this reason that the Court has refused to condemn tying agreements unless a *substantial volume of commerce* is foreclosed. In *Fortner, supra,* the Court elaborated that the requirement that "not an insubstantial" amount of commerce be involved makes no reference to the scope of any particular market or to the share of that market foreclosed by the tie ... "Normally, the controlling consideration is simply whether a total amount of business, substantial enough in terms of dollar—volume so as not to be merely *de minimis* is foreclosed to competitors by the tie, for as we said in *International Salt [Company, v. United States*, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947)] it is 'unreasonable *per se* to foreclose competitors from any substantial market' by a tying arrangement." *Fortner, supra,* 394 U.S. at 501, 89 S.Ct. at 1258. Testimony shows that the dollar value of dedicated cane milled in the St. Mary/Iberia area was in excess of to 9 million dollars from defendants' sources alone. Therefore, the amount of trade affected clearly is not insubstantial.

The next level of inquiry is whether or not the tying and forcing is economically

harmful. Jurisprudence shows tying is economically harmful where power and the market for a *tying product* is used to create *additional power* in the *tied market*. *Jefferson Parish*, 466 U.S. at 36, 104 S.Ct. at 1570 (O'Connor, concurring). After the closing of the Oaklawn Mill and the sale of the Raceland Mill, defendants had *no power* in the tied market, i.e., the sugar cane mill market. However, defendants *created power* for themselves in the tied market by interjecting themselves between the land owner and the farmer in the leasing of land and tying the lease of the land to the selection of the mill. Defendants created extensive power for themselves in a market where heretofore they had none. Even prior to the closing of the Oaklawn Mill and the sale of the Raceland Mill, defendants had created *additional power* for themselves in the tied market by controlling the destiny of substantial amounts of sugar cane which otherwise would have been available for milling by any of the five local mills. Clearly, their power in the *tied market* was increased by their manipulation of the *tying* market, competition was destroyed in the tied market and therefore, the forcing which occurred is economically harmful.

Considering the foregoing, the underlying rationale and spirit embodied in the policy and language of the Sherman Antitrust Act has been violated by the tying agreements which are before this Court.

Because the concurring opinion in the Supreme Court's most recent pronouncement on this issue, i.e., *Jefferson Parish*, 466 U.S. 2, 32–47, 104 S.Ct. 1551, 1568–1576, argued strongly that per se condemnation should be closely scrutinized if not done away with altogether, this Court feels that an analysis under Rule of Reason is not inappropriate.

■ If defendants do not have either the degree or kind of market power that enables them to force a significant number of farmers to take their cane to the selected mill in order to lease land and thereby establish a per se violation, this does not necessarily end the inquiry. An anti-trust violation can nonetheless be established by evidence of an unreasonable restraint on competition in the relevant market, thus requiring a focus on the anti-competitive effects in the market or markets in which the two products are sold. The common core of the adjudicated unlawful tying arrangement is the *forced purchase of a second distinct commodity with the desired purchase of a dominant tying product, resulting in economic harm to competition in the tied market Jefferson Parish*, 466 U.S. at 18, 104 S.Ct. at 1561, citing *Times–Picayune*.

The market involved in analysis under Rule of Reason is not necessarily the same market involved under the per se violation. In the per se violation the initial focus is on the market of the *tying product*, in Rule of Reason the primary focus is on the *tying* market and *the anti-competitive effects therein*. Because of the unique nature of the sugar cane industry and the geographic restraints involved and given the relationship between the sugar cane producer and the servicing mill, this Court has found the two relevant geographic markets to be the same. Therefore, an inquiry into the actual effect of the contract on competition in the area in and around the five local mills is needed.

The Supreme Court has condemned tying arrangements when the seller has some "special ability—usually called 'market power' to force a purchaser to do something that he would not do in a competitive market. "When 'forcing' occurs our cases have found the tying arrangement to be unlawful." *Jefferson Parish*, 466 U.S. at 14, 104 S.Ct. at 1559. However, the Court has drawn a distinction between "the exploitation of market power by merely enhancing the price of the tying product, on the one hand, and by attempting to impose restraints on competition in the market for a tied product, on the other ... if that power is used to impair competition on the merits in another market, a potentially inferior product may be insulated from competitive pressures. This impairment could either harm existing competitors or create barriers to entry of new competitors in the market for the tied product and can in-

crease the social costs of market power by facilitating price discrimination, thereby increasing monopoly profits over what they would be absent the tie ... and from the standpoint of the consumer—whose interest the statute was especially intended to serve—the freedom to select the best bargain in the second market is impaired by his need to purchase the tying product and perhaps by an inability to evaluate the true cost of either product when they are available only as a package." Id. at 14–15, 104 S.Ct. at 1559–1560.

■ The concurring opinion in *Jefferson Parish* noted that the Court's prior opinions indicate that the purpose of tying laws has been to identify and control those tie ins that have a *demonstrable exclusionary impact* in the tied product market or that abet the harmful exercise of market power that the seller possesses in the tying products market. According to the Court, under the Rule of Reason, tying agreements should be disapproved only in such instances. The Court explained that tying may be economically harmful or have exclusionary impact in the tied market where power in the market for the *tying product* (i.e., here, land) is used to create *additional market power* in the market for the tied product (i.e., here, the mills). The antitrust laws are concerned with tying when those positioned as the master lessors are here, threaten to use their market power to acquire additional power in the tied market. However, such extensions of market power are unlikely unless the two markets in question and the nature of the two products tied satisfy three threshold criteria established by the Court:

1. First, the seller must have power in the tying-product market.

2. Second, there must be a substantial threat that the tying seller will acquire market power in the tied product market.

3. There must be a coherent economic basis for treating the tying and tied markets as distinct.

Therefore, where sugar companies, such as the defendants in this case, artificially interject themselves between the land own-

er and the farmer and use their market power to acquire additional market power in the mills market creating an environment susceptible to driving out competing mills or making it more difficult for new mills to enter the market, an inquiry should be made as to the three factors noted by the concurring Court in *Jefferson Parish* on pages 37–38, 104 S.Ct. on pages 1571–1572.

■ *First, the seller must have power in the tying product market.* In *Jefferson Parish* the hospital had 30% of all patients and this was found not to be sufficient market power. No matter how one wishes to interpret the land use figures presented in evidence before this Court defendants do not control the requisite 30% of the market. Therefore, one must determine whether or not the product itself, i.e., large contiguous tracts of sugar cane land is in and of itself sufficiently unique so the rationale of *Northern Pacific, supra* can come into play, i.e., minimum market power is required. Here, at issue are large contiguous tracts of sugar cane land which become available for lease generally on a 5–7 year cycle. Large contiguous tracts of sugar cane land are a finite and perhaps unique product in the defined market. The Court in *Jefferson Parish* in footnote 6 at page 37 of 466 U.S., page 1571 of 104 S.Ct., cites *Northern Pacific* for the proposition that only a minimal showing of market power is required because of the *unique nature* of the product. However, this does not end the inquiry.

The Court addressed the common misconception that a unique product suffices to demonstrate market power. "While each of these three factors might help to give market power to a seller it is also possible that a seller in these situations will have no market power. *Jefferson Parish, supra* at 37 n. 6, 104 S.Ct. at 1571 n. 6 (O'Connor, J., concurring). Therefore, this Court must make an inquiry as to the *market power*." (emphasis added)

In *U.S. Steel Corporation v. Fortner Enterprises,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (*Fortner II*) cited in *Jefferson Parish,* 466 U.S. at page 37, n. 6,

104 S.Ct. at page 1571 n. 6, the Court conducted a more extensive analysis of whether,

"The tie was actually an exercise of market power, considering such factors as size and profitability of the firm seeking to impose the tie, the character of the tying product, and the effect of the tie—the price charged for the products, the number of customers affected, the functional relation between the tied and tying products."

There was limited evidence as to the size and profitability of the plaintiffs in this matter; however, it is clear plaintiffs were large enough and profitable enough to enter into the illusory master leases with the land owners and to undercut the farmer in obtaining the land. However, that was done at a time when plaintiffs anticipated being able to recoup the loss by milling the captive cane at their mills. At present, plaintiffs are left with an illusory set of contracts and no apparent manner by which to recoup their losses but for the tolling agreements.

The tying product, i.e., sugar cane, is unique in character. As noted, the cane is grown by farmers and is sold by farmers to sugar mills. The effect of defendants' actions is to eliminate competition among the mills for farmers and their cane. The farmers have lost completely any negotiating rights and/or leverage they had thereby removing any influence the farmers might have had on what price they are paid by the mills, the efficiency of the mills, the time table for payments, the transportation payment and arrangement and any other competitive criteria. The effect of the tie is to completely destroy competition within the market as to dedicated cane. The farmers no longer have any input in the sale of their crop.

The price charged for the land vis a vis the master lessor and the land owner is illusory—the master lessor undercut the farmer by agreeing to pay a premium price for the land. The farmer cannot compete with the master lessor; to do so would automatically create a loss for the farmer. However, the master lessor by virtue of its size and position can pay the premium price for the land and recoup that cost from either its own mills by milling profit or by entering into tolling agreements with mill owners. Effectively, the mill consumer, the farmer, is completely taken out of the loop. This results in an increase in the cost of cane for the mills which in turn results in an increase in the cost of sugar.

The number of customers affected by the contracts before this Court is limited. However, the *probable number* of consumers affected is substantial as an artificial market has been created which can be entered by anyone who has the financial capability to "buy in" as land becomes available. To limit the inquiry to only this frozen snapshot of time presented by plaintiffs would be shortsighted. Further, the number of ultimate consumers, i.e., buyers of sugar at an increased cost is arguably quite large. There is a strong functional relationship between the tied and the tying products given the very nature of the products involved.

The collective evaluation of all of the factors considered illustrates an exercise of market power by the defendants. The Supreme Court notes that absent such power tying cannot conceivably have any adverse impact on the tied product market, and can be only pro-competitive in the tying market. This is not the case before this Court. There is substantial adverse impact in the tied product market, i.e., competition for the tied farmer's cane has been eliminated. Therefore, there is no impetus for the mills to compete for the farmers' cane and thereby no impetus for them to be responsive to the needs of those who utilize their services. There is no impetus to become more cost effective and efficient or to be responsive to the power of supply and demand or the effects of competition. There is *no pro-competitive* effect in the tying or the tied product market.

The master lease does not increase competition for land, rather, it creates an *artificial* market wherein parties who have the cash can come and undercut the farmers thereby creating an artificially inflated market. This provides no benefit to the

farmer, the ultimate consumer, or if one accepts testimony of Fred Clark, vice-president of Sterling Mills, the mills. There might have been a time the defendants could have successfully argued the tying arrangement provided some benefit by securing a stable source of cane for their mills; however, that time is past. Even if one were to accept defendants' argument, clearly, this did not work as the Oaklawn Mill closed and the Raceland Mill was sold. Therefore, it is questionable whether or not defendants' argued benefit from the tying agreement ever actually existed; however, this is beside the point. Once the two mills were no longer with defendants, defendants had no basis for the continuation of the tying agreements except to obtain the capital necessary to feed their illusory contracts. No one benefits from this arrangement beyond the land owner, who is receiving an artificially high price for his land, and defendants who are receiving the bounty from their tolling agreement.

*Secondly, there must be a substantial threat that the tying seller will acquire market power in the tied product market.* The Supreme Court notes that "no such threat exists if the tied product market is occupied by many stable sellers who are not likely to be driven out by the tying, or if entry barriers in the tied product market are low." *Jefferson Parish*, 466 U.S. at 38, 104 S.Ct. at 1572. The history of the sugar cane milling industry in and around the St. Mary/Iberia area is one of *instability* not stability. The entry barriers in the market are high as entry into the mill market requires tremendous cash outlay at "the front end" on the hope it can be recouped by milling enough cane "on the back end". Sugar cane mills have been going out of business at an alarming rate. One of the major keys to the survival of the sugar cane milling industry is a stable supply of cane. He who has a guaranteed supply of cane will survive and can expand; he who does not will not. Evidence established sugar mills are very cash intensive at the initial stages of entry . and expansion; therefore, sufficient supply of cane must be forthcoming to recoup the initial cash outlay and create a return on the invest-

ment. Therefore, he who controls the cane supply controls the entry into the market and profit or loss and survival or death of each of the sugar cane mills in the area. Competition is best served if it is the farmer as producer of the cane and consumer of the mills' services who holds that power. Otherwise, the master lessors can chose to control the majority of the acreage serviced by the mills, and extract whatever bounty they wish from any one or more of the existing mills and the mill or mills would have to pay the bounty in order to survive. Therefore, new mills could not enter the market without the blessing of those who control the cane nor could existing mills expand without the same blessing. All this would be done based not upon the beneficial effects of competition, but upon the payment of the highest bounty. This new player, by manipulating the artificial market, could completely manipulate and control who could operate in the mill market. The historical instability of the sugar mill industry argues that the mills are not capable of enduring such a practice. If the majority of the sugar cane is tied to existing mills for protracted periods of time, extensive barriers will be created to the entry into the market by new mills or expansion by existing mills. The tying arrangement grants immense power in the tied product market; but, to the tying seller, not the consumer. Consequently, the tie in this matter remains extremely suspect. *Jefferson Parish, supra* at 39, 104 S.Ct. at 1572 citing *Atlantic Refining Co. v. FTC*, 381 U.S. 357, 371, 85 S.Ct. 1498, 1507, 14 L.Ed.2d 443 (1965).

*Third, there must be a coherent basis for treating the tying and the tied products as distinct.* The *Jefferson Parish* Court notes that, "For the products to be treated as distinct, the tied product must, at a minimum, be one that some customers might wish to purchase separately *without also purchasing* the tying product. When the tied product has no use other than in conjunction with the tying product, a seller of the tying product can acquire *no additional* market power by selling the two products together." *Jefferson Parish*, 466

U.S. at 39, 104 S.Ct. at 1572 (O'Connor, J., concurring). Some customers might wish to purchase mill services without leasing land, i.e., if the farmer owns his land. Consequently, the mill provides services to people who do not lease land, i.e., land owners who farm their own land. Therefore, the tied product, i.e., the mill services, have a use other than in conjunction with the lease of land.

*Even though these three conditions are met, under the Rule of Reason a tie in may prove acceptable if it fails the Rule of Reason balance test. Jefferson Parish, supra* at 41, 104 S.Ct. at 1573. "Tie-ins may facilitate new entry into fields where established sellers have wedded their customers to them by ties of habit and custom ... they may permit clandestine price cutting in products which otherwise would have no price competition at all because of the fear of retaliation from the few other producers dealing in the market. They may protect the reputation of the tying product if failure to use the tied product in conjunction with it may cause it to malfunction ... And as the tied and tying products are functionally related, they may reduce cost through economies of joint production and distribution." Evidence presented supports none of these beneficial effects in the tying agreement that is before this Court. As noted, the only potential benefit of this tie agreement *might* have been to create a stable supply of sugar cane to the defendants' mills, i.e., Oaklawn and Raceland, however, for whatever reason defendants chose to close Oaklawn and sell Raceland before the master leases had expired. No benefit to society has been shown; the tying makes the cost of milled cane higher and acts to insulate the mills from the effects of competition. The tie in and its anti-competitive impact outweigh whatever benefit it might create. Therefore, application of these criteria to the case at hand is straight forward; the tie provision must fall.

Therefore, the defendants have market power and can obtain additional market power in the defined geographic area for land. Second, there is clear evidence the defendants have acquired market power over the mills. This market power allows defendants opportunity to drive out existing mills and erect barriers to entry into the market by controlling the one absolutely necessary factor in sugar cane mill operation, i.e., the source of cane. Third, there is a sound economic reason for treating sugar cane land distinct from mill services. And in balance, without the tying agreement the defendants at present have *no* power within the mill market. They control no cane, produce no cane, they own or operate no sugar cane mills. However, with the tie agreements they have created substantial power for themselves in the tied market and destroyed competition. Therefore, the Master leases with tying provisions increases the defendants' power over the mills and confers little, if any, benefit upon the mills, the farmers, or the ultimate consumer. Therefore, this Court finds the tying agreement as entered into by the defendants is a violation of § 1 of the Sherman Act under the Rule of Reason analysis even if not a per se violation of the Act.

### DAMAGES

"In the typical tying arrangement, the victim's injury lies in the higher price that must be paid for the tied product as a result of the seller's economic power in the tying product market. Accordingly, the ordinary measure of damages would be the difference between the price actually paid for the tied product and the price at which the product could have been obtained on the open market." *Pogue v. International Industries, Inc.*, 524 F.2d 342, 344 (6th Cir.1975). To the same effect, *Bell v. Cherokee Aviation Corp.*, 660 F.2d 1123 (6th Cir.1981), *Northern v. McGraw–Edison Co.*, 542 F.2d 1336 (8th Cir.1976).

These damages reflect, in most cases, at least, the *anti-trust injury* which is a necessary predicate to recovery. This causal requirement was set out in *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), where the Court said:

"Plaintiff must prove *anti-trust* injury, which is to say injury of the type the

anti-trust laws were intended to prevent and that flows from that which makes defendant's acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation. It should, in short, be 'the type of loss that the claimed violations ... would be likely to cause.'" *Brunswick Corp., supra* at 489, 97 S.Ct. at 697. [Emphasis in original.]

The plaintiff bears the burden of proving an anti-trust injury which flows from defendants' unlawful acts. See, *Malcolm v. Marathon Oil Co.*, 642 F.2d 845 (5th Cir. 1981).

■ In this case, as already discussed, the tying product was sugar cane farmland for lease. The defendants made the lease of land a "lever" to force Breaux Brothers to use a designated mill which, Breaux Brothers testified, it would not have used but for the defendants' power in the tying market of farmland. The loss which flows from this unlawful act, and which Breaux Brothers seeks as damages, is the difference in the profit it could have made without the tie and the amount it actually made with the tie.

These are the measure of damages in the typical tying case because, *but for the anti-trust activity, Breaux Brothers would have earned at least the amount of money it made under the tying arrangement.* There is no evidence whatsoever that the tying arrangement sapped Breaux Brothers (or any other plaintiff) of its ability to obtain equipment, supplies, or the cash necessary to run its operations. The only effect of the tying arrangement was to reduce the amount of profits that Breaux Brothers was able to obtain.

The damages claimed by Breaux Brothers are not seriously disputed by defendants, and total, according to adequately supported evidence, $15,189.83. Once injury caused by an anti-trust violation is proved, damages need not be shown with mathematical exactitude, *Malcolm*, supra. The Court accepts the claims of Breaux Brothers, and trebles it, per 15 U.S.C. § 15. (This section, which grants a private right

of action, was enacted as a part of the Clayton Act in 1890, and applies to *all* private anti-trust actions.) The statute also mandates an award of costs and attorneys fees, and, pursuant to the agreement by the parties to defer evidence on this issue until after a ruling on the primary issues, the Court hereby refers this issue to a hearing to be scheduled before the Magistrate, who will make a report and recommendation to the Court. The plaintiff and defendant shall submit their initial evidence on the issue of costs and attorneys fees to the Magistrate within 10 days of this ruling so that a hearing can be scheduled. The parties will thereafter follow a scheduling order issued by the Magistrate. The parties will have an opportunity to review and make objection to the Magistrate's report and recommendation, as per 28 U.S.C. § 636.

■ The injury alleged, and thus the damages sought by Accardo and Teche Planting are far different. Each of these plaintiffs refused to sign the contract which contained the tying arrangement, and each ceased farming the land involved. Accardo later found other land and resumed farming, while Teche Planting has, to date, not resumed its farming operations on acreage equal to the amount lost. Accordingly, both plaintiffs seek to recover all of the profits they would have made had they signed the lease and continued to farm as they had in the past.

The issue, as to these plaintiffs, is whether the damages they seek were *caused* by defendants' unlawful acts. This Court concludes that these defendants have failed to prove that the losses they claim were caused by the tying provision in the lease.

These plaintiffs rely on *Ware v. Trailer Mart, Inc.*, 623 F.2d 1150 (6th Cir.1980) to support their theory that they may recover damages for leaving business in the face of a contract which contains a tie. However, there are important differences between the Sixth Circuit's decision in *Ware* and this case.

In *Ware*, the plaintiff owned a mobile home and desired to move into a mobile

home park owned by defendant. There he was told that he could only rent space if he purchased a mobile home from defendant. Plaintiff refused to lease trailer space from defendant because he already owned a mobile home and did not wish to buy another one. Instead, he leased an apartment, and sought damages in the amount of the apartment lease, as well as the cost of storing his mobile home in which he was unable to live.

The only issue relevant to this case decided in *Ware* was that plaintiff, as a consumer, had standing to bring an anti-trust action. This was the holding of *Reiter v. Sonotone Corp.*, 442 U.S. 330, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), issued the year prior to the court's decision in *Ware*.

*Ware*, being a "consumer" case, did not involve a claim for the loss of *future profits*, but simply the *direct outlays of cash which were necessitated by defendant's illegal tie*. The Sixth Circuit found Ware had standing to *make his claim* under § 4 and ... to "sue to recover damages for the alleged violations of § 1 of the Sherman Act." *Ware* at 1153. This does not give sufficient support to these plaintiffs' claims for *loss* of *all* argued *business profits*, as opposed to *direct cash outlay caused by the illegal tie*. Here, the loss of *all* profits is the result of plaintiffs' *choice* not to farm at all, not the result of the mill selection. Defendants did not prohibit Accardo and Teche Planting from farming or make it so financially onerous that to farm would have been without profit. Even with the mill selection some profit would have been made if one is guided by the Breaux Brothers' experience. Therefore, it is not reasonable to assess as damages resulting from defendants' actions amounts which could have and would have been earned *even with defendants' actions fully realized*. Rather, the damages *caused* by defendants' action are those Accardo and Teche Planting would have suffered if they *had farmed* with the tie. No evidence to support an award of this amount was presented. Accardo and Teche Planting could have chosen to leave the land and still have maintained their claim for violation of the Act; therefore, they can recover only those damages *caused* by *defendants' actions*.

As illustrated by the many cases in which the plaintiffs *have* successfully recovered lost profits, there must be a *causal connection* between the illegal actions and the loss of business. For example, in *Malcolm*, supra, the plaintiff claimed that the defendant's illegal actions *destroyed his ability* to make a profit and therefore drove him out of business. He did not *choose* to leave the business in which he could have made a profit *even with the illegal tie*.

The causation analysis in *Lehrman v. Gulf Oil Corp.*, 464 F.2d 26 (5th Cir.1972) is instructive. There, defendant objected to plaintiff's recovery of future profits because this would have allowed the plaintiff, who had been the victim of an anti-competitive practice, to walk away from his business and collect damages, despite the argued possibility that the business might still be operated successfully. The Fifth Circuit rejected defendant's arguments but grants guidance:

> "When a practice condemned by the Sherman Act *puts a small operator out of business*, we do not think it matters whether the anti-trust violated directly closes down the small proprietor or whether he takes anticompetitive steps which foreseeably will result in the proprietor's demise if carried on for a sufficient amount of time.... the facts of the present case give no hint that Lehrman abandoned a successful gas station in the hopes of securing a large judgment in his favor. After 1965 Lehrman struggled along until finally it was clear that the station *was not worth his while*." *Lehrman v. Gulf Oil Corp.*, 464 F.2d at 45. [Emphasis added.]

The court, in footnote 17, set out Lehrman's declining sales of gasoline from the beginning of the anti-trust activity to the time he ceased business operations. These statistics reveal that the anti-trust activities of the defendants *caused a continual decline* of sales and profits *to the point the business was not worth Lehrman's*

*while to operate.* "On the facts of the present case, there was evidence from which a jury might conclude that Gulf's decision to punish Lehrman by means of its TCA system for his failure to abide by Gulf's system of 'suggested' prices *caused the demise of Lehrman's station."* *Lehrman* at 45. [Emphasis added.] Here, there was no such evidence presented. By holding that Lehrman need not wait until he became bankrupt before filing an antitrust action, the court did not eliminate the need for a *causal connection* between the *illegal activity* and the *destruction* of the business.

The contrast between *Lehrman, Malcolm* and this case can be seen in the evidence put forward by Breaux Brothers. Its primary claim is that its profits *were not as great* as they could have been without the tying arrangement, and that the tie deprived it of the opportunity to make greater profits. Neither Breaux Brothers nor any plaintiff suggested this tying arrangement did or would in the future prevent it from conducting successful farming operations; there is no evidence in the record that supports this possibility.

Accardo and Teche Planting failed to prove this essential causal link between the alleged illegal tie and the broad damages they claimed. Had Accardo and Teche Planting continued their lease, farmed and presented evidence of the damage caused them *or* left the land but presented evidence of the amount they would have lost if they had farmed, i.e., but for the tying agreement—they could have supported damages recoverable *as caused* by the illegal tie. However, neither Accardo nor Teche Planting did so.

Two cases which are more factually apt are *Flood v. Kuhn,* 309 F.Supp. 793 (S.D.New York 1970) and *Kapp v. National Football League,* 586 F.2d 644 (9th Cir. 1978). Both cases involve athletes who refused to sign a contract which contained alleged anti-trust violations and sought as damages the money they would have made had they signed the contract and played. In *Flood,* which was before the court as an application for a preliminary injunction, the court found that there was no showing of irreparable harm to the baseball player. Flood's argument was that his career was necessarily brief and that an injunction was required in order to permit him to continue to play baseball, and make the money which would be available to him only as a baseball player. The Court responded:

"Plaintiff's argument is compelling, but contains a basic flaw. Plaintiff is not wholly excluded from baseball. He has been offered a contract by the Philadelphia Club for the 1970 season at the same $90,000.00 salary he earned at St. Louis. It is his *choice* not to play baseball. He has a duty to mitigate his damages. Accordingly, we must view his potential injuries not as those which may occur if he chooses not to play baseball, but as those which he will nonetheless suffer if he does play baseball." [italics in the original] *Flood v. Kuhn,* supra at 800.

*Kapp* involved a suit by a former NFL quarterback who sued the NFL and the team which offered him the "tainted" contract, seeking the amount of that contract, which he had refused to sign. The jury rejected Kapp's claim for damages, finding that his loss of the contract amount was not caused by the defendant's anti-trust violation. The appellate court, upholding the jury's verdict, stressed that Kapp was required to prove that he was injured *"by reason of"* one of the unlawful practices. The court found it significant that Kapp could have signed the contract and reserved his right to challenge the anti-trust rules, but refused to do so.

In this matter, it strikes this Court as significant that these two plaintiffs could have followed the course of Breaux Brothers and farmed under the contract, *while reserving their right to and in fact contesting the offending clause.* Defendants' designated mill provision did not *prevent* Teche Planting and Accardo *from farming,* nor was evidence presented that the designated mill provision acted or would act to destroy their business of farming. Accardo and Teche Planting were offered a contract by the defendants; they could have

farmed and produced revenue under this contract—even with the mill designation. It does not therefore seem to this Court that the entire loss of revenue from their choice not farm at all is owed as damages as having been *caused by* the designation provision. Rather, the damage which could have been caused by *defendants' actions* is the difference between what was or could have been earned by farming the land and taking the cane to the designated mill and what could have been earned by farming and taking the cane to the mill of their choice. This Court was presented with no evidence by Accardo and Teche Planting upon which to make such a finding. There was no reason established by credible evidence why these plaintiffs could not have taken the same course as Breaux Brothers. Accardo and Teche Planting have failed to carry their burden of proof to establish the amount of damages for the defendants' violation.

 However, this Court finds that Accardo and Teche Planting, while they have failed to prove the *amount* of damages suffered, have proved both anti-trust injury and the *fact* of damage. Therefore, under the rule enunciated in *Sciambra v. Graham News*, 892 F.2d 411 (5th Cir.1990), these plaintiffs have established their right to costs and to attorneys fees under 15 U.S.C. § 15. Therefore, as with Breaux Brothers, this Court refers the issues of costs and attorneys fees to the Magistrate for a report and recommendation, as set forth above..

EXPENSES DUE UNDER STATE LAW

 Plaintiffs, Teche Planting and Accardo, also seek to recover for expenses incurred in the preservation and upkeep of the land which they had leased from Prudential from the expiration of their lease at the end of 1989 through April 5, 1990 when they left the land. It is not contested that agreement was made to pay "expenses."

Defendants do not dispute Teche Planting's and Accardo's entitlement to expenses, but the parties differ as to the definition of "expenses" and therefore the amount of expenses owed.

Plaintiffs claim, in essence, a proportion of their yearly overhead for the operation of their farm. They assert that these are the "expenses" which defendants promised to pay and which are due. Defendants point to a letter dated April 5, 1990 in which they recited their agreement to pay "actual out-of-pocket" expenses, arguing this evidences their agreement only to pay certain types of expenses which are far less than plaintiffs claim.

It is difficult to determine, upon the evidence presented whether the Court is faced with an ambiguity in terms under a contract or whether the parties' differences are so fundamental that there could not have been a meeting of the minds on this fundamental issue. Whether there is ambiguity, a missing term, or no contract at all, it is appropriate to turn to positive law for guidance. See La.C.C. Art. 1757 and Art. 2054. It is clear that defendants have agreed to pay some expenses, an obligation already existing under Louisiana law. In the absence of a clear and specific agreement which alters the obligations created under the Louisiana Civil Code, the Court turns to the positive law to find guidance as to the extent of defendant's obligation. See, La.C.C. Art. 2054.

The rights of a lessee to remove improvements and additions made to the land leased is governed, according to La.C.C. Art. 2726, by C.C. Arts. 493, 493.1, 493.2 and 495. See, *Harvey v. Surles*, 228 So.2d 167 (La.App.1969).

According to these provisions, defendants are obligated to pay, at their option, the current value of the materials and of the workmanship or the enhanced value of the immovable. Defendants have elected to pay the current value of the materials and workmanship, and assert that this is the same as the "out-of-pocket expenses" which they had previously offered to pay. Evidence presented by the plaintiffs argues the plaintiffs desire the current value of the materials and workmanship as well.

Therefore the Court finds that the following expenses are due Accardo:

| | Materials |
|---|---|
| Chemicals | $ 8,173.05 |
| Fuel | $ 4,371.61 |
| Insurance | $ 7,717.24 |
| Utilities | $ 954.65 |
| Pumping expenses | $ 2,497.00 |
| Subtotal | $23,713.55 |
| | Workmanship |
| Labor | $38,973.15 |
| Miscellaneous | $ 719.84 |
| Payroll taxes | $ 3,773.92 |
| Subtotal | $43,466.91 |
| TOTAL | $67,180.46 |

The Court finds that the following expenses are due Teche Planting:

| | Materials |
|---|---|
| Chemicals | $ 1,700.00 |
| Fuel | $ 556.83 |
| Insurance | $ 1,942.70 |
| Repairs | $ 689.86 |
| Supplies | $ 180.80 |
| Subtotal | $ 5,070.19 |
| | Workmanship |
| Labor | $ 9,890.34 |
| Miscellaneous | $ 26.04 |
| Payroll taxes | $ 1,285.11 |
| Subtotal | $11,201.49 |
| TOTAL | $16,271.68 |

For the reasons stated above, this Court grants judgment in favor of plaintiff, Breaux Brothers, Inc. in the amount of $15,189.83, and trebles this amount under 15 U.S.C. § 15. The Court finds that although prejudgment interest is now available under this statute, the restricted circumstances in which prejudgment interest is available are not applicable, and prejudgment interest will not be awarded. The Court does grant to Breaux Brothers, Inc. costs and reasonable attorneys fees. The decision as to the amount of attorneys fees having been deferred by stipulation of the parties, this issue is hereby referred to Magistrate Methvin, who will schedule a hearing and issue a report and recommendation as set forth above.

Further, while this Court finds that Accardo and Teche Planting have failed to prove the *amount* of damages suffered, they have proved both anti-trust injury and the *fact* of damage. Therefore, these plaintiffs have established their right to costs and to attorneys fees under 15 U.S.C. § 15 and the Court also refers the issue of attorneys fees to the Magistrate for a report and recommendation, as set forth above.

Finally, this Court finds that Teche Planting is entitled to $16,271.68 in expenses incurred while preserving the land of lessor, Teche Sugar. Accardo is entitled to $67,180.46 in expenses incurred while preserving Teche Sugar's land.

Upon final ruling on the amount of attorneys fees, the parties are directed to prepare and submit a jointly approved judgment to this Court in accordance with this opinion.